SOUTHERN RY. CO. v. UNITED STATES.

No. 13788.

United States Court of Appeals
Fifth Circuit.

June 27, 1952.

Rembert Marshall, W. Neal Baird, Atlanta, Ga., for appellant.

H. A. Stephens, Jr., Asst. U. S. Atty., F. Douglas King, Asst. U. S. Atty., J. Ellis Mundy, U. S. Atty., Atlanta, Ga., for appellee.

Before HOLMES, BORAH, and RIVES, Circuit Judges.

BORAH, Circuit Judge.

The Southern Railway Company brought this action under the Federal Tort Claims Act[1] against the United States of America to recover damages for injuries caused to its rolling stock and equipment as the result of a collision at a railroad crossing in Chamblee, Georgia between one of its fast passenger trains and two large, crane trucks belonging to the United States Navy. The government answered, denying liability, and filed a counterclaim against the railroad, alleging that the collision was due solely to the negligence of the railroad, and seeking recovery for damage to the cranes. The case came on for trial before the District Judge, who found that both the railroad and the government were negligent; that such negligence concurred in proximately causing the collision; and that neither of the parties could have avoided the consequences of the negligence of the other. In applying the Georgia comparative negligence doctrine, the court found that the injured parties were equally negligent, and entered judgment that the railroad take nothing by its complaint and the government should recover nothing on its counterclaim. The railroad alone has appealed.

The material facts are these: At around 7:25 P.M. on January 13, 1948, the passenger train New Yorker, consisting of two diesel locomotives and eleven coaches, was proceeding north from Atlanta, Georgia at a rapid rate of speed. At the same time a large Sterling crane, weighing twenty tons and belonging to the United States Navy, was proceeding north along Peachtree Road Extension, towing a disabled 12 ton Reo crane enroute to the naval air station which is located near the incorporated town of Chamblee, Georgia. At the edge of Chamblee, which is a part of greater Atlanta, Peachtree Road Extension runs immediately adjacent and parallel to appellant's railroad tracks on the west and is intersected on the right hand side by a highway about thirty feet wide which runs in an easterly direction across the tracks toward the naval air station.

1. 28 U.S.C. §§ 1346, 2671 et seq.

This highway intersects Peachtree Road Extension at an angle greater than 90 degrees. The sharpness of this turn, together with the extreme weight, length, and lack of maneuverability of the two cranes, combined on that night to make their crossing of the tracks a most difficult operation.

As the Sterling crane and its tow reached the intersection, Petty Officer Gallenger, who was driving the lead crane, cut his steering wheel sharply to the right and proceeded slowly across the southbound [2] and northbound tracks until his left front wheel ran off the road on the northern side of the grade crossing. Thereupon, he reversed the crane's motor, backed up to a point where the front of his vehicle almost cleared the northbound track, and again put the crane truck in forward gear. This time the crane proceeded until its left front wheel rested on the far spur track on the edge of a shallow ditch—its further progress being obstructed by a signal light pole 4½ feet from the highway as well as by a hand car lying on the shoulder of the road. Whereupon, Gallenger stopped the crane and by means of the foot brake held it from rolling forward into the ditch. At about this time a naval officer heard the New Yorker sound its horn some distance south of the crossing. He immediately warned the crane detail of the impending danger and directed certain members thereof to run along the track toward the train and signal it to stop. The first to depart on this mission, Aviation Machinist's Mate Sides, had scarcely left the crossing when the automatic crossing bells commenced to ring and the red signal lights to flash; these warning devices having been set off automatically by the New Yorker's locomotive when it reached a point 2100 feet south of the crossing. Gallenger saw the signal light flashing and hurriedly double clutched the crane truck, in an attempt to put it in reverse gear so as to back off of the track, but his foot slipped off of the brake causing the Sterling crane to lunge forward, and throwing him against the steering wheel. About this time he quickly looked out of the cab window of his vehicle straight into the headlight of the onrushing train, and jumped to a point of safety just an instant before the collision.

In the meantime, the New Yorker continued to approach the crossing at a speed of approximately sixty miles per hour, its engineer and fireman being unaware of the presence of the cranes on the crossing. A map of the crossing prepared by the railroad shows that an engineman approaching from the south could see it from a distance of 1150 feet. A naval officer, who investigated the accident, fixed the point of nonvisibility at 1336 feet. Be that as it may, the main headlight of the locomotive did not fall on the crossing until it reached a point approximately 300 feet therefrom, due to the fact that up to that point a 1 minute 45 degree curve caused the headlight to shine to the right of the track.

When the locomotive reached a point about three hundred and fifty feet south of the crossing, the engineer and fireman simultaneously saw the two huge cranes, which were painted yellow and brightly illuminated by floodlights, running lights, reflectors, headlights and tail lights. None of the trainmen had seen the sailors running down the track waiving flashlights, although Sides reached a point nearly 300 feet from the crossing before the locomotive rushed past him. Immediately upon spying the cranes, the engineer removed his foot from the "dead-man" pedal and thrust forward the emergency brake lever. There was expert testimony to the effect that had the New Yorker been travelling at 55 to 60 miles per hour, it would have required at least 800 to 1000 feet to bring it to a stop by an emergency application of the brakes. After colliding with the cranes, the New Yorker plowed up the rails for a considerable distance, derailed the spur track, several coaches turned over, and its locomotive came to a stop approximately 1100 feet beyond the crossing.

The principal questions presented by this appeal are: Whether the railroad was negligent in running the train at a speed of 60 miles per hour at the time and place of the accident; and, if so, whether such neg-

2. One proceeding east over the crossing encounters first the southbound track, then the northbound track, and finally a spur track.

ligence proximately contributed to cause the collision.

■ Section 94–506, Georgia Code, as amended March 25, 1947, reads in part as follows:·

"* * * after reaching the blowpost furthest removed from said crossing, and while approaching said crossing, he [the engineer] shall keep and maintain a constant and vigilant look- out along the track ahead of said engine, and shall otherwise exercise due care in approaching said crossing, in order to avoid doing injury to any person or property which may be on said crossing, or upon the line of said railway at any point within 50 feet of such crossing."

There is no fixed standard in the law by which a court may say in every case what conduct shall be considered reasonable and prudent, and what shall constitute due care in approaching a crossing under any and all circumstances. Accordingly, the law has relegated the determination of such questions to the trier of facts. It is for them to note the special circumstances and surroundings of each particular case and then say whether the conduct of the parties measured up to the standard required by law. Moreover, it is settled Georgia law that questions of negligence, including contributory negligence, comparative negligence, and what negligence constitutes the proximate cause of the injury, are all questions of fact and will not be determined by the courts as a matter of law except in palpably clear, plain, and undisputed cases. Atlantic Coast Line Railway v. Key, 5 Cir., 196 F.2d 64; Stanaland v. Atlantic Coast Line Ry., 5 Cir., 192 F.2d 432. Where, as here, the crossing is located in a populous town or city, although the standard of care remains the same, in order to measure up to that standard it may be necessary for the railroad to take precautions which would not be necessary at the ordinary crossing in the country. And the mere presence of safety precautions, such as automatic signaling devices, does not, as a matter of law, render the railroad free from negligence and relieve it from adopting such other measures as public safety and common prudence dictate. This is especially true where the evidence shows that a train was running at an undue and highly dangerous rate of speed over a much frequented crossing located in a city or town. Grand Trunk Railway Co. of Canada v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485.

Appellant contends that the trial judge concluded that a finding of negligent speed was demanded as a matter of law because the train approached the crossing without the engineer having it under such control as would have enabled him to bring it to a stop short of the crossing upon discovering the presence of the cranes thereon. We do not so interpret the trial judge's findings and conclusions. On the contrary, we think that the trial court, in finding that the railroad was negligent in running its train at a speed of 60 miles per hour while approaching that particular crossing on the night in question, correctly determined the question as one of fact and resolved it only in the light of all of the attendant facts and circumstances. These include, among others, the location of the crossing in an unincorporated town; the unusual amount of traffic to be expected at the crossing; the physical relationship between the dangerous crossing and the curve in the track, which reduced the area of illumination normally afforded by the locomotive's headlight at night; the public interest in speedly transportation; the fact that the crossing was protected by automatic signaling devices; the great distance required in order to bring a train such as the New Yorker, traveling at the speed which it was, to a stop in an emergency; and the fact that the railroad personnel were thoroughly familiar with all of these facts and circumstances.

■ The question as to the existence of negligence of both the railroad and the United States; the question as to whether the negligence of each proximately contributed to cause the appellant's injuries; and the question as to whether their negligence was equal under the Georgia comparative negligence doctrine, are all questions of fact which could not, under the peculiar facts of this case, be determined

926

as a matter of law. Having in mind that the case was tried largely upon oral evidence before a district judge, who had an opportunity to hear the evidence and observe the demeanor of the witnesses, we have carefully considered the entire evidence to determine whether the findings of the trier of fact are clearly erroneous. United States v. Hill Lines, 5 Cir., 175 F.2d 770; Wald v. Eagle Indemnity Co., 5 Cir., 178 F.2d 91. Suffice it to say, we do not have a definite and firm conviction that a mistake has been made. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

The judgment of the court below is affirmed.