**TEXAS AND NEW ORLEANS RAILROAD COMPANY, Appellant,**

v.

**John Dixon PETTIT, Appellee.**

No. 5085.

Court of Civil Appeals of Texas.

Beaumont.

May 4, 1956.

Rehearing Denied June 6, 1956.

Keith, Mehaffey, McNicholas & Weber, Beaumont, for appellant.

J. F. Gardner, San Antonio, Thos. A. Wheat, T. J. Hightower, Liberty, for appellee.

R. L. MURRAY, Chief Justice.

This is an appeal from a judgment in favor of John Dixon Pettit, appellee, against Texas and New Orleans Railroad Company, appellant, in the district court of Liberty County, for damages for personal injuries received in a night-time collision of a truck and a railroad tank car.

Appellee Pettit was the driver of a large van-type truck, driving west along High-

way 90 near Dayton in Liberty County about 3 o'clock in the morning of November 4, 1950. His truck collided with a tank car which was a part of one of the appellant's freight trains, operating on a track which crosses Highway 90 at that point. The appellant's main line track between Houston and Beaumont is practically parallel to Highway 90 in the area west of Dayton. It is appellant's branch line from Dayton to Baytown which turns south from the main line at that point. There is a "wye" leading from the main line to the branch line, consisting of an east leg and a west leg, which are about 600 to 700 feet apart. Shortly before the collision the freight train moved along the east leg of the wye going south and after the engine and several cars had crossed the highway, the train stopped and the tank car was stopped across the highway. Pettit was driving his large truck loaded with coconuts from New Orleans on his way to San Antonio. The truck with its load weighed about 40,000 pounds. He had left New Orleans about noon and got to Liberty about 10:30 p. m. where he parked on the side of the road and slept until about 2:30 a. m. He then awoke, went to a cafe and had pie and coffee and then headed west through Dayton. Dayton is about six miles west of Liberty. He drove through Dayton with his lights on dim and continued with his lights on dim until he reached a point where, according to his testimony, he considered his position to be outside the lighted section of the town and raised his lights. When he did so he was about 50 or 60 feet from the east leg of the wye crossing Highway 90 and for the first time saw the stopped tank car on the highway in front of him. According to his testimony he was going about 30 miles an hour, and he immediately put on his brakes and pulled to the left. The front end of his truck hit the south end of the tank car. The front end of his truck was jammed into and partially under the tank car, and Pettit was pinned in the wreckage of the cab of his truck. He received severe and painful injuries. He was fully conscious and remained in the cab while others labored for over an hour to extricate him from the truck. He suffered comminuted fractures of both legs and right ankle, and fractures of the knee cap of the left leg. He was in a hospital in Dayton until November 7, 1950, then was in the Methodist Hospital in Houston, where he has had several operations, including skin grafts and bone grafts. He now wears screws in his legs and specially built steel braces and specially built shoes.

The appellant railroad had installed automatic crossing signal lights and a bell on the crossing where the collision occurred. This was the type of crossing signal by which a warning is given to highway traffic by flashing lights and a ringing bell, and this one was set to operate and give such a warning when a train reached a point within 257 feet of the crossing. One large item of controversy in this lawsuit is whether this automatic crossing signal was functioning at the time of the collision. All members of the train crew testified that the signals were working, the lights were flashing and the bell ringing as Pettit's truck approached the crossing with the tank car stopped on the highway. The conductor, fireman, the engineer and two brakemen testified positively that they saw the lights working before the accident. A State Highway Patrolman arrived at the scene immediately after the collision and he testified that the signals were working when he got there, and that he noticed the lights when he was about 300 feet from the crossing. A deputy sheriff likewise arrived shortly after the collision and he noticed the flasher lights working when he was 300 or 400 yards away from the crossing; another truck driver going west on Highway 90 testified that the lights were working; another truck driver going east testified the lights were working. Pettit, however, testified that the lights were not working; that he had been over this road many times before, knew that a warning light was there and expected the signal lights to warn him if a train was on the crossing. The evidence in regard to the functioning of the crossing signals will be discussed in more detail in the consideration of appellant's points in regard thereto.

The appellee filed its suit against the appellant, alleging that the railroad crossing was an extra-hazardous nighttime crossing and that the railroad had full knowledge of such fact; that for sometime prior to the collision appellant had been carrying on extensive switching operations in the vicinity of the crossing and knew, or with the exercise of ordinary care should have known, that the signal lights were not working; that he relied upon the signals working, and was in ignorance of the fact that they were not functioning at the time he approached the crossing; he alleged the presence of extraneous lights and the conditions prevailing to the east of the crossing and that the tank car which he struck was of a dark color, blending into the highway; he alleged that the appellant was negligent in failing to have the lights properly functioning, in failing to properly inspect the signals, and failing to illuminate the crossing, place flares and in failing to maintain a proper lookout for travelers on the highway. These acts were alleged to be the proximate cause of the collision and the consequent injuries. He alleged his injuries in detail.

The appellant railroad company answered by general denial, a general plea of contributory negligence on the part of the appellee, unavoidable accident, and a special plea that the appellee violated Section 86 of Article 6701d, Vernon's Revised Civil Statutes of Texas, in that he failed to stop his truck immediately prior to the collision, and further alleged that the violation of those sections of the statute was the sole cause "and/or a proximate cause" of the accident made the basis of the suit.

The case was tried to a jury and the jury by its verdict found in answer to special issues submitted that (1) the conditions surrounding the crossing were such as to render the crossing more than ordinarily dangerous at nighttime at the time of the collision; (2) that the electrical warning devices failed to work just before and at the time of the collision; (3) that such failure was negligence and (4) was a proximate cause of the collision; (5) that the appellant prior to the collision knew or should have known by the exercise of ordinary care that the warning signal devices were not working; (6) that the appellant acquired such knowledge, or could have done so in the exercise of ordinary care, in such length of time that he could have place a flagman at the crossing to warn appellee of the train blocking the crossing; (7) that the failure of the appellant to place a flagman at the crossing to warn appellee of the train blocking the crossing was negligence and (8) was a proximate cause of the collision; (9) that the appellant acquired such knowledge that the warning signal devices were not working, or could have acquired such knowledge in the exercise of ordinary care, in such length of time that it could have placed flares at the crossing to warn appellee of the tank car blocking the crossing; (10) that such failure was negligence and (11) was the proximate cause of the collision; (12) that the appellant knew before it blocked the crossing that the electrical warning devices were not working; (13) that it was negligence for the appellant to block the crossing while such warning devices were not working and (14) that such negligence was a proximate cause of the collision. In answer to issue No. 15 the jury did not find that appellee Pettit, as he was approaching the crossing, was driving his truck at a speed in excess of 30 miles per hour. In answer to issue No. 17 the jury did not find that Pettit, as he approached the tank car on the east leg of the wye, was operating his truck at an excessive rate of speed under the facts and circumstances pertaining. In answer to issue No. 20 the jury did not find that Pettit failed to keep a proper lookout for the train. In answer to issue No. 22 the jury did not find that the failure of Pettit to stop his truck before attempting to cross the east leg of the wye was negligence. In answer to No. 24 the jury found that the collision was not the result of an unavoidable accident. In answer to the issue on the amount of damages, the jury found $50,000.

The appellant filed a motion for judgment non obstante veredicto, which was overruled by the court. Judgment was rendered for the appellee, and appellant filed its

motion for a new trial and an amended motion for new trial. The amended motion was overruled and the appellant has duly perfected its appeal.

Appellant brings its appeal under six points.

### First Point

The trial court erred in overruling defendant's motion for judgment non obstante veredicto.

#### Sub-point 1–A

The testimony was insufficient to warrant the submission of Special Issue No. 2 as to the failure of the signal lights to function.

#### Sub-point 1–B

There was no testimony warranting the jury's answer to Special Issue No. 3 that the failure of the signals to work (if they did fail) was negligence.

#### Sub-point 1–C

There was no competent testimony upon which the jury could find that the defendant could have foreseen the failure of the lights to work (if they did fail).

### Second Point

The plaintiff was guilty of contributory negligence as a matter of law.

#### Sub-point 2–A

The physical facts show that the plaintiff was driving at a speed in excess of thirty miles per hour.

#### Sub-point 2–B

The physical facts show that had the plaintiff been driving at a speed less than thirty miles per hour he could have seen the train in time to have stopped.

#### Sub-point 2–C

The undisputed testimony shows that Pettit was driving at a speed whereby he could not stop within the range of his vision.

#### Sub-point 2–D

The evidence conclusively establishes that Pettit failed to keep a proper lookout at the time and place in question.

### Third Point

The court erred in refusing to submit the defendant's issues of the plaintiff's negligence in driving the truck with his lights on the low or depressed beam.

### Fourth Point

The court erred in refusing to submit the defendant's issues embodying the defensive theory of Section 86, Article 6701d, R.C.S.

### Fifth Point

The court erred in permitting plaintiff's witness, Young, to give opinion evidence as to the cause of the failure of the signals to function since the witness was not an expert.

### Sixth Point

The verdict of the jury is excessive.

Under the appellant's first point is presented the basic point of controversy in this lawsuit, that is, was the testimony sufficient to warrant the submission of Special Issue No. 2 and to support the jury's affirmative answer thereto in regard to the failure of the warning signal lights to function. Following closely in importance to this main question are the subsidiary questions whether the failure of the signals to work (if they did fail) was negligence and whether the appellant could have foreseen the failure of the signals to work (if they did fail). It is necessary to set out in some detail the evidence as produced on the trial by both parties. We have read and studied the entire statement of facts with the exhibits, and believe that the briefs of the parties have fairly and accurately set forth, and at times summarized this evidence, and we take most of the following résumé from the briefs themselves.

The appellant attacks the jury's finding that the signals were not working and maintains that the testimony is wholly insufficient in that the uncontradicted testimony was that the signals were the latest,

most approved fool-proof devices known to man and that said signals had been properly maintained and would not and did not fail to work at the time and place in question. It says also that as to the jury's finding that the failure of the signals to work was negligence, the testimony showed that said lights were of the most modern design, in general use throughout the United States, and had been properly supervised and maintained, and that appellee's own witness testified that there was no possible manner under which the appellant could have anticipated or foreseen the failure of said lights (if they did fail), consequently there is no testimony which would warrant a finding of negligence in the maintenance of the signal devices. The appellant then quotes from the record of the trial as given by the witnesses before the jury.

The type of signal installed was the so-called automatic device and a great deal of the testimony has to do with the intricate mechanism thereof and the means by which the signal is activated. On behalf of the defendant Howard A. Thompson, an electrical engineer employed by Union Switch & Signal Company of Pittsburgh, Pennsylvania, the manufacturer of the signal device, testified relating to the signal. After giving his qualifications, consisting of a B.S. degree in engineering and having been engaged in the production of railway signal equipment since 1920, Mr. Thompson stated that he was presently employed as a consultant engineer for Union Switch & Signal. He had examined the signal involved herein and went over the diagram thereof which appears in the statement of facts, and stated that the signal device was installed substantially as shown on the diagram. He stated that this particular device was manufactured by his company and that he assisted in the development of this particular device. Asked specifically as to the particular device being modern, the witness Thompson had this to say:

"Q. I will ask you if that particular signal is modern, approved and accepted type of signal? A. Yes, it is a modern, approved and accepted type of highway crossing protection, and accepted in the eyes of the American Association of Railroads who have made extensive study to be sure they had satisfactory designs.

"Q. Is that as near satisfactory as it is possible to manufacture? A. I think it is.

"Q. Is it designed so you have more than one source of power? A. Two powers.

"Q. Why? A. That is to be certain that you have the same protection if you lose the commercial source of supply.

"Q. You then fall back on what? A. Your battery."

Thompson described to the jury from a model the interlocking relay, stating that the contact points inside of the relay itself were silver to silver and silver to impregnated carbon contacts, and that when a train crosses the activated rail it closes the circuit so that one armature drops to start the operation of the device.

Thompson testified that on the particular sign at Dayton there were four additional lights on the standard or post holding up the signal, vertically spelling out the word "Stop" which flash on and off.

Concerning the manner in which the device works, Thompson's testimony can be summarized in this manner: If the track battery should fail the flasher mechanism begins to operate and operates continuously until the track battery is replaced or the track is energized; if a wire from the battery to the insulated joint came loose "it would always fall safe"; that if the electric power fails "the storage battery takes over and supplies the normal danger signal. That is the light of the flasher lights," and continues to function as long as the circuit is occupied; if the batteries went out the commercial power works the signal device. If both the commercial power and the battery went off at the same time the signals would not work, but so long as there was one source of power either from

the battery or the commercial power the signals would work.

Thompson testified that it would be impossible for someone to get into the case and to start the signals to working within thirty to forty seconds.

He further testified as follows:.

"Q. Is it manually or automatically operated? A. Automatically.

"Q. Does the human hand have anything to do with turning the signal on or off other than through the operation of the train? A. No, sir.

"Q. In your long experience I will ask you if there is a better type signal that you know of that can be used? A. No, sir, there is not.

"Q. Have you, in all of your years of experience in the development of these signals, have you known of one that failed? A. I don't believe that there is a known case of the signal itself failing. It is possible, through gross negligence of maintainers that the equipment will not operate. But with reasonable maintenance, that is, maintenance called for by the A.A.R., it is practically impossible. There are no known failures under these conditions.

"Q. I want to ask you if these signals were maintained under the maintenance called for by the A.A.R., in your opinion, would they fail? A. No, sir, I do not believe they would. They are designed under the fail-safe principle.

"Q. What do you mean, fail-safe? A. It is a term used in railway signal fields. It means you always put the signals to their most protective position, and if they fail, they will failsafe. That is, you will have lights at the crossing.

"Q. I assume by that, that if the signal fails, it will go red and won't go green? A. That's right. In this particular case, the most protective position is flashing.

"Q. That is what you call fail-safe? A. That is correct.

"Q. I will ask you, if from your examination of this signal setup out there today, if it was set up under the usual, customary and standard erections? A. It was.

"Q. As for maintenance, what did it show? A. It looked as if it was maintained in very nice condition."

C. C. Billingslea is the signal supervisor having supervision over the particular signal in question and described in great detail the manner in which the signal device actually worked. With reference to the failure of the signal device, Billingslea testified:

"Q. What source of power do you have to operate it? A. We have batteries to take care of part of it, and we have city lights, like these here, to take care of the rest of it.

"Q. What happens if the track batteries go dead? A. The lights continue to flash.

"Q. What happens if your track battery connection breaks? A. The same thing, they flash on and off. The lights themselves ordinarily burn from the commercial power.

"Q. What happens if the commercial power fails? A. There is a transfer relay in the case that transfers the lights from commercial power to battery.

"Q. So, if the City lights go off, you have a battery that furnishes the power for the lights? A. Yes, sir, the transfer relay in the case, transfers the lights from the commercial power to the battery. That is what we call a standby battery.

"Q. Where is your standby battery? A. It is in the case.

"Q. If the city lights go off, what happens? A. The lights work off of the standby battery."

Billingslea testified about this particular signal light being a modern device in this language:

"Q. This particular type signal device I have been questioning you about, I will ask you whether it is a modern or obsolete type? A. It is modern.

"Q. In your thirty-six years experience, is there a more modern type available? A. An automatic crossing gate has been designed that puts an obstruction across the road. That may be more modern.

"Q. That has been developed? A. Yes.

"Q. This signal device that you had there at that crossing on November 4, 1950, does it comply with all of the State and I.C.C. regulations? A. It is designed by A.A.R., and the State of Texas approved it when it was bought.

"Q. Did they pay any part of the installation cost? A. 90% of it."

Billingslea testified that in all of his twenty-nine years as a signal man he had never known of a failure of this type of flasher signal.

Billingslea testified that the American Association of Railroads promulgates certain standards of maintenance and that signal inspectors and supervisors make periodic inspections. This particular signal was under the supervision of signal maintainer Sandifer, whom he had known since 1925, and Billingslea stated that he had known Sandifer since that time and that he was one of the most reliable men he had ever known.

The defendant offered signal maintainer B. E. Sandifer, an employee of the railroad since 1925 and a resident of Liberty for the past nineteen years, where he had been employed as a signal maintainer. This particular signal was within his territorial jurisdiction and he made periodic inspections of the particular signal device involved in this case.

In his testimony Sandifer sets out in detail the particular inspection routine he follows each week when he makes his tests. He stated that he had never found a loose connection on this particular signal because if there were any loose connections the signal would not work.

This particular accident happened on November 4 and Sandifer had made an inspection on the day previously, that is, November 3. He exhibited his battery card and it was offered in evidence showing the date of his inspections. Sandifer testified that on November 3, the date prior to the accident, he made his inspection and gave this testimony:

"Q. On November 3rd, 1950, did you make an inspection of that signal? A. I did.

"Q. What did you do on November 3rd? A. I read the voltage on all of the cells in the battery, the voltage was 205. I boosted the rectifier output from .025 milliamperes to .050 milliamperes.

"Q. Were there any loose connections? A. No.

"Q. Was there anything wrong with the signal then? A. No, sir.

"Q. Did you clean it up? A. Yes.

"Q. Did you shunt it out? A. Yes, sir.

"Q. Nothing was wrong with the signal then? A. No, sir.

"Q. Did you perform the usual and customary inspection required by your rules on that occasion? A. Yes, sir."

He heard about the accident the morning of its occurrence, sometime shortly after 3:00 o'clock, and he got there about 4:00 o'clock prior to the time the truck had been moved and while the driver was still in the cab. He stated that he could see the signals working before he got to the crossing, but that he couldn't make his test until the train had got off of the crossing. During

all of this time the signals continued to work and eventually the tank car was re-railed and the crossing cleared. His test was made immediately thereafter and he gives the results in these words:

"Q. Eventually, they got the tank car rerailed and got the crossing cleared? A. Yes.

"Q. What did you do then? A. I took my shunt wire and shunted it out. In other words, I played train with it.

"Q. What did you find? A. I found nothing wrong. It was working like it should.

"Q. Was it necessary for you to do anything to it to get it to working? A. No, sir.

"Q. Did you look at the batteries? A. Yes, sir.

"Q. Did you have a light? A. Yes, sir, a big beam light, a light that the company furnishes us with four batteries; a good light.

"Q. Was it necessary to make any repairs to the signal device at that time? A. No, sir.

"Q. When you got there, was that signal case locked or unlocked? A. Locked."

This was followed by testimony that there was nothing wrong with the signal device, either before or after the accident, Sandifer using these words:

"Q. I will ask you, based on your experience of twenty-odd years whether or not there was anything wrong with that signal that night? A. No, sir, there was not.

"Q. Was there anything wrong, any loose connections, dust, or anything wrong with that signal when you inspected it on November 3rd, 1950? A. No, sir.

"Q. Your next inspection was less than twenty-four hours later? A. Yes, sir.

"Q. Was anything wrong with that signal then? Any loose connections, any dust or anything wrong with it at that time? A. No, sir."

Conductor Alford, in charge of the particular train in question, testified that the particular cut or cars involved consisted of nineteen cars and the engine and tender. He stated that he did not actually see the collision but heard the impact and immediately ran to the scene of the collision and noticed that the signal lights were working at that time, and that as a matter of fact, he had seen the signal lights working before the collision actually occurred. After the accident he crossed over and went to the telephone to report the accident and that the signal lights were working at that time. He denies that he had any knowledge of how to operate the signal or to activate them and that he had nothing to do with the starting of the signals.

Locomotive engineer Jacobs stated that the engine, prior to the collision, was pulling the cut of cars out of the yard and that as he approached or came out on the east leg of the wye and approached the intersection of Highway 90 and before he reached the crossing the signal lights were working, having started to work when he hit the track circuit. The cut of cars was going very slowly and the engine stopped after it had cleared the south side of the highway some seven cars beyond the edge of the highway. From his position in the cab he could not see vehicles approaching from the east on Highway 90 and did not actually see the truck prior to the collision. The accident occurred at a time when the train was stopped and he immediately got down off his engine and noticed that the flasher lights were working, and he heard the bell on the signal device ringing and the lights were flashing at that time. Jacobs denied having anything at all to do with the signal case that night and as a matter of fact stated that he had nothing to do with it, nor did he even know what was inside of the signal box.

Locomotive fireman Staha was riding on the left side of the locomotive that night,

the locomotive being headed south Staha would be on the east side. Staha's testimony with reference to the signals functioning is given in this language:

"Q. As you came down your track there, did you notice before you get to Highway 90 whether the signal lights were working there at the crossing as the locomotive approached it? A. Yes.

"Q. You did notice it? A. I did.

"Q. As you approached Highway 90, what are the facts as to whether or not the signal lights were or were not working? A. They were working.

"Q. They were working? A. Yes, sir.

"Q. Is there any doubt about it? A. No, sir.

"Q. As you were seated there in your cab, was there a signal light on your left? A. Yes, sir.

"Q. That particular light, as you crossed that highway, was that signal light working or not working? A. It was working."

Staha was watching for the signal from the brakeman so that he could in turn relay it to the engineer when he saw the truck approaching. His version of the matter is then given in this language:

"Q. At the time you saw the truck bearing down on the train, at that moment, were the signal lights working? A. Yes.

"Q. There is no doubt in your mind about that? A. No."

Staha denied any knowledge of how to activate the signals and specifically denied having anything to do with starting the signals that night.

Head brakeman Marshall dropped off the train about one hundred fifty feet north of Highway 90, and at such time looked down and noticed the signal lights on Highway 90 working, and the engine was over the crossing at that time. He stated that he saw the lights working and heard the bell ringing. After the train had been stopped for possibly a minute, the lights continued working. He actually saw the collision occur and immediately ran to the truck and at that time the lights were working and the bell ringing, but Marshall had nothing to do with starting the device to functioning.

Rear brakeman Pendleton was north of Highway 90 and east of the east leg of the wye aligning a switch. With reference to the signal lights working Pendleton had this to say:

"Q. When you were standing in the vicinity of that No. 1 switch, were you then in a position to see the signal lights on Highway 90? A. Yes, sir.

"Q. You could? A. Yes, sir.

"Q. At the time the train was making that movement south, across the crossing, were those lights working? A. Yes, sir.

"Q. Did you see them working? A. Yes, sir.

"Q. There is no doubt in your mind about that? A. No, sir.

"Q. The train got off of the number one track before it got on the wye? A. Yes, sir.

"Q. Were you around that No. 1 switch then? A. I don't recall.

"Q. Could you see the signal lights when the engine crossed Highway 90? A. Yes, sir.

"Q. What are the facts with reference to whether or not the lights were or were not working at that time? A. They were.

"Q. There is no doubt in your mind about that? A. No doubt at all."

State Highway Patrolman Prater arrived at the scene of the accident immediately after its occurrence, and as he approached the crossing the signals were working, and that he was able to notice the lights working

when he was about three hundred feet from the crossing at a time when he was driving about forty to forty-five miles per hour, but that he had no difficulty in bringing his vehicle to a stop before he reached the crossing.

Liberty County deputy sheriff Tommy Waring arrived at the accident shortly after its occurrence and as he approached the crossing he noticed the flasher lights working when he was some three or four hundred yards before he got to the crossing, and that the signal lights continued to work as he approached the crossing and continued to work until the crossing was cleared. Waring had lived in Dayton thirty-three years and had never known the signals to fail to work when a train was on the crossing.

W. A. Ogg was a truck driver and was proceeding in a westerly direction along Highway 90 and as he approached the crossing he noticed the signal lights were working when he was back at the Cleveland road intersection. Ogg stated that there were no store lights or business lights to interfere with his vision of the signals at the crossing and that having used that crossing twice a day for four and a half years he had never had occasion to come onto the crossing when a train was occupying it when the signal lights were not working.

. Kenwood Parker was a truck driver for Henke & Pillot making the run between Houston and Beaumont five nights a week for the past ten years. He approached the crossing from the west proceeding easterly and saw the signal lights were working before he came into the crossing. The light continued to flash and the bell continued to ring while he was there for about thirty minutes. Parker also testified that during the hundreds of times he has been over this crossing at night he has never known the signal device to fail.

Appellee Pettit testified on cross-examination as follows:

"Q. Mr. Pettit, when did you first see the train blocking the crossing? A.

I didn't see the train blocking the crossing until I was in about fifty or sixty feet of it.

"Q. At the same time you saw it, where were you looking? A. Straight down the highway.

"Q. How long had you been facing straight down the highway going through Dayton? A. I always face the pavement.

"Q. Do you ever glance to the right or to the left? A. Yes, I glance to the right and to the left, but other than that, I always face the pavement."

* * * * * *

"Q. How fast were you driving when you first saw the tank car across the highway? A. Not over thirty miles an hour.

"Q. Had you raised your lights immediately before you saw the tank car? A. I didn't see the tank car until I did raise my lights.

"Q. That is when you realized the tank car was in front of you across the highway? A. Yes, sir.

"Q. What did you do then? A. I immediately put on my brakes.

"Q. Did you do anything to your truck? A. Yes, sir, I pulled it to the left. It looked like a ditch to the right, so I slammed on my brakes and pulled to the left.

"Q. What part of the tank car did you hit? A. The south end of it, on the left hand side of the highway.

"Q. About where on the highway were the trucks or wheels of the tank car? A. On my left hand side, on the pavement; that is what I hit, the front wheels or trucks, was right in front of me."

Pettit testified with reference to the signal lights in these words:

"Q. At the time you collided with the train and immediately prior to the

time you collided with the train, were the flasher lights working? A. No, sir.

"Q. Were the lights that spelled out the word 'STOP' in red burning? A. No.

"Q. Was the bell ringing? A. No, sir.

"Q. Were there any lights there? A. No, sir.

"Q. Were all the lights at that crossing out? A. Yes, sir, they were all out. There were no lights there.

"Q. As you were approaching that crossing, had you observed the highway signs and railroad sign back east of the crossing? A. Yes, sir, the railroad sign."

He testified with reference to his headlights again in these words:

"Q. You have testified that with your lights on dim, as you had them, that your lights would reflect on the highway ahead, some one hundred feet? A. Yes, sir.

"Q. Will you tell the jury why you didn't sooner see the tank car blocking the crossing? A. My lights on dim were sloped down, and set to shine on the righthand side of the pavement; sloped down. The main part of your lights only extend out a hundred or a hundred and twenty-five feet. If anything is directly in front of you, you couldn't see them."

Immediately after the collision one of the train crew came up to the collision. Pettit said:

"Q. After this brakeman, or member of the train crew crawled over the end of the tank car, what happened to the lights? A. Just after he jumped down on the other side, about thirty or forty seconds, or something like that, the lights came on and the bell started ringing."

The appellee summarizes the evidence in support of the jury's findings, and presents the following:

The plaintiff, John D. Pettit testified, without contradiction, that he had been to New Orleans and was on his way back to his employer's headquarters in San Antonio; that he had left New Orleans on Friday afternoon at 1:30 p. m. with a load of coconuts driving a 2½ ton GMC truck with a trailer; that he stopped in Liberty, Texas at about 10:30 p. m. that same day and went to sleep in his truck and slept through until about 2:30 a. m. Saturday, November 4th. Upon awakening, he went to a nearby cafe in Liberty and had some coffee and pie and left Liberty at about 2:45 a. m.; that he proceeded west on Highway 90 and stopped at the first caution light after pulling up a hill coming into the town of Dayton. He described in detail his progress through the town of Dayton up to his approach to the track and testified flatly and unequivocally that the flasher lights of the defendant at the crossing were not working; that the lights that spelled "STOP" were not working; that the bell was not ringing and there were no lights at the crossing.

Mr. Pettit also testified that he had driven a truck all over East Texas; that he had been driving a truck for 37 years; that he had crossed this crossing hundreds of times before; that he knew the flasher and stop lights were at the crossing and had been there for a long time. He also testified that if the lights at the crossing had been operating he could have seen them from five to seven hundred feet.

There was evidence that the flasher signals had failed on many occasions prior to the collision in question and after the collision in question.

Mr. Neth Kay, Constable of Dayton, Texas for 20 years and thoroughly familiar with the crossing in question, testified that ten, twelve or fifteen days prior to the collision here in question at about 6:00 a. m. in the morning he was traveling east, approached the east leg of the "wye" driving his automobile with his lights on; that a

train was blocking the crossing moving slowly towards Goose Creek and that on that occasion the flasher signal lights were not working and never did operate. He further testified that on another occasion, three weeks or thirty days after Mr. Pettit's collision, at 10:00 or 11:00 o'clock at night that he was traveling west; that he came upon a train across the west leg of the wye across the crossing; that the lights were not working; that he waited until the entire train crossed the crossing and the lights never did work or operate. He also testified that about thirty days after the last described incident, at about 6:00 or 6:15 in the morning, he was going west out of Dayton and approached the east leg of the wye; that there was a train across the crossing and there were no lights burning; that the lights never did work or show red.

L. A. Haltom testified that in the summer of 1950 he left Dayton going toward Houston on Highway 90 hauling a load of lumber; that when he got to the east leg of the wye he saw a train backing into the crossing and there were no lights working at that crossing; that the train was going south across the highway; that he stopped and stayed there until it cleared the highway crossing; that the lights never worked and the bell never rang.

J. L. Brock, who was running a paper route for the Houston Chronicle at Dayton in 1948 testified that he was driving his Ford automobile on or about October 10, 1948 late at night, traveling east from Houston; came up upon the crossing where the T. & N. O. Railway crosses Highway 90 just west of the Valley Courts in Dayton; that there was a train across the crossing and stopped; that the lights were not lighting up the crossing; that the bell was not ringing; that there was a flasher light system at the crossing; that while waiting for the train to clear the track he observed the lights and they never came on.

Bob Lawrence, a member of the jury panel who was disqualified, testified he has been using Highway 90 for about 20 years; was acquainted with the crossing in question; that about two years prior to the trial of this case (Trial commenced January 11, 1955) he was coming to Liberty from the Houston Oilfield Equipment in a truck; that there was a train blocking the crossing and he had to stop; that he stayed there until the train cleared the crossing; that the lights were not working and never did work.

W. R. Oakley testified he lived in Dayton from 1943 to 1951 and used Highway 90 frequently and was acquainted with the east leg of the wye; that in the early Fall of 1951 at about 2:30 a. m. he was driving towards the east leg of the wye; that there was a train blocking the crossing; that the lights were not working; that he "pretty near ran into the train before I saw it"; that the lights were "dead" and he did not hear the bell ringing; that it was a dark clear night; that he did not see the train blocking the crossing until he was 40 to 45 feet from it; that he applied his brakes and stopped rapidly within 15 feet of the train. He also testified that in the Fall of 1949 he was headed toward Dayton and came upon the east leg of the wye towing a car that had broken down west of Dayton; that there was a train stopped across the crossing; that the signal lights were not working at the time and the bell was not ringing; that he had many occasions to come up to that crossing when the lights were working and that when they were working they could be seen in plenty of time to stop; that they were "plenty adequate when they are working"; that he had been across that crossing many, many times and that he depended on the signal lights at the crossing.

Plaintiff introduced into evidence a letter supplied by the defendant listing the accidents at the east leg of the wye from 1942 to date. This reflected that from 1942 until 1949 there were no accidents recorded at that crossing, but that starting in the Fall of 1950 there were three accidents there; one on September 28, one on October 7, and the instant collision on Novem-

ber 4. This also reflected that from 1951 to 1953 no accidents had been recorded at this crossing.

B. E. Dandifer, signal maintainer for the defendant, testified from his records that on July 20, 1950 the batteries in the signal case at the east leg of the wye were removed and sent to the Maintenance Way Shop for repairs "account signal hit by a car driven by Roy Hudspeth, Jr." and these batteries were brought back and put into the case on October 20, 1950, just 15 days prior to the collision in question. He also testified that he had been the signal maintainer for all the flasher signals at Dayton since they were installed on June 8, 1937 and had maintained them ever since that time; that he had never changed any of the wires under the highway which go into the relay case since 1937 and had never changed any wires since he had been with the company.

The plaintiff, John D. Pettit, testified that after he had collided with the tank car a person that he took to be a member of the train crew, the brakeman, was the first person to come to him just a minute or so after the collision. He then went on to testify as follows:

"A. I don't remember who was the first one that spoke. He asked me if I was hurt and I asked him why he didn't have some lights on the crossing.

"Q. What did he say? A. He said he was waving his lantern and hollering and I asked him again why he didn't have some lights on the crossing and he told me he was waving his lantern and hollering and the third time I told him to get some lights on or put some flares out behind my truck because there were three more trucks coming behind me and if he didn't get some lights they would ram me clear through that car.

"Q. Then what did he do? A. He turned around and jumped over the end of the tank car on the other side."

This testimony of the plaintiff, that his first inquiry of the first person to get to him was a question as to why there were no lights burning and no protection on the crossing, was corroborated by a member of the train crew, Pendleton.

James O. Pendleton, rear brakeman and member of the train crew, testified as follows:

"Q. As soon as you knew there was a collision, you immediately went to the scene of the collision? A. Yes, sir.

"Q. When you got there Mr. Marshall was there? A. He was there, yes, sir.

"Q. As soon as you got there, you heard Mr. Pettit talking? A. Yes, sir.

"Q. He was talking there in the presence of you and Mr. Marshall, wasn't he? A. Yes, sir.

"Q. And Mr. Pettit was still pinned in the truck? A. Yes, sir.

"Q. He remained there, I believe you said, about an hour? A. Yes, sir.

"Q. He was suffering great pain wasn't he? A. I presume he was.

"Q. He was taking on? A. Yes, he was.

"Q. Didn't you, when you got there, hear Mr. Pettit say 'Why don't they put lights on these tracks? A. I don't recall that.

"Q. Mr. Pendleton, didn't you give your deposition in August, 1953 over in Houston in the office of Baker, Botts, Andrews and Parish in this same case? A. Yes, sir.

"Q. You were sworn to tell the truth and nothing but the truth, so help you God, before you gave that deposition? A. Yes, sir.

"Q. Now, on page 61 of your deposition, you were asked the question

'What did he say about not having any protection? What was it you heard him say', and in answer to that question you said, 'He said, why don't they put lights on these tracks or something like that. He mumbled it, it wasn't distinct.' Isn't that what you said? A. Yes, sir.

"Q. If you testified to that over in Houston, it was the God's given truth wasn't it? A. Yes, sir.

"Q. And that was as soon as you got down there? A. Yes, sir.

"Q. Now he was also begging you there, right after this collision to knock him in the head and get him out of his misery? A. Yes, sir.

"Q. How long would you think it took you to run down there after you heard the collision? A. Not long. I would be afraid to estimate it, but not long.

"Q. You went right on down there? A. Yes.

"Q. Those were the first things you heard that man say? A. Yes, sir.

"Q. Mr. Pendleton, he appeared to be suffering great pain up until the doctor came and gave him a shot? A. I didn't see the doctor.

"Q. But for some time, he was carrying on, groaning and begging you to kill him and get him out of his misery? A. Yes, sir."

The witness, William Howard Marshall, Jr., brakeman and member of the train crew, testified that he dropped off the train roughly 150 feet north of Highway 90; that he had a switch lamp with a little exposed bulb white in color; that he saw a heavy van truck approaching from the east about a hundred and forty to a hundred and sixty yards from the crossing when he first saw it; that he started running toward this crossing, hollering and waving his lamp. This witness also testified by way of deposition that was introduced into evidence by the plaintiff as follows:

"Q. What did you do when your attention was first attracted to the truck? A. I ran toward the crossing, waving my light and hollering."

Marshall also testified as follows on cross examination:

"Q. You knew those lights were put there, about eight inches in diameter, to warn people approaching that crossing, of the presence of a train there on the crossing? A. I knew the lights—I don't know the dimensions— were put there to protect the traffic.

"Q. You knew at night, when they were not working, that there was danger of a man running into the train? A. Yes, sir.

"Q. You had been in a position to tell whether those lights were working or not working before this collision? A. Yes, sir.

"Q. And I believe you testified that they were working? A. Yes, sir.

"Q. And, notwithstanding, it is your testimony before this jury, that you had, as Mr. Pettit was back there 420 feet from this crossing, come right down there when you had four big red flasher lights, going off and on, alternating, with that sign spelling the word 'STOP', you came storming down there like 'Sea Biscuit' to warn him? A. I was doing anything to stop that man from hitting that train that night."

Witness, Robert R. Young, an electrical contractor, qualified as an expert witness. Prior to testifying he had studied defendant's Exhibit No. 8 (which is the electrical layout of the flasher signals at the east leg of the wye), for three or four days and understood the drawings and the principles on which it worked and had had an opportunity to observe the model of the flasher system produced by the defendant in the court room. He testified that with his experience he could take the drawing and install the flasher signal shown on the plan.

A hypothetical question was presented to him encompassing the facts in evidence in this case, concluding with the question:

"What, in your opinion, was the cause of the lights not to work immediately prior to the collision?"

The witness answered as follows:

"A. I would say the relay could fail to drop down and you would have no lights.

"Q. Is that what you call sticking of the relays? A. Yes.

"Q. What else? A. Loose connection."

On cross examination he testified further:

"Q. So long as the power is on, the bell continues to ring and the lights continue to burn? A. Yes, if the relay is closed.

"Q. If the commercial power goes off, it automatically goes on battery? A. Yes.

"Q. The batteries themselves, inside the case, then operate the lights and the bell? A. Right.

"Q. It is so rigged up if one or the other of those two powers fail, the other operates the signal? A. Right.

"Q. So the only way it could fail would be a failure of both sources of power? A. If the relays are working."

The witness repeated his assertion that a sticking relay or a loose connection could cause the failure.

On re-direct he testified further:

"Mr. Hightower: Q. As I understand from the plans and your testimony you have electricity furnished by the Gulf States Utilities Company, and you also have what is known as standby batteries? A. Right.

"Q. But regardless of where you get your source of electric current, wheth-er from the City of Dayton or your standby battery, in order for the flasher to work, the current has to come back out of this relay box? A. It has to make a complete circuit.

"Q. It has got to come out? A. Right.

"Q. So if you have stuck interlocking relays, or it is hung up and you don't get any current coming out, then you don't have any lights? A. Right."

It was undisputed that shortly after the collision the lights began to function. This witness gave the following explanation concerning this aspect of the operation of the lights:

"Q. Now, Mr. Young, assuming those facts I have given you to be true, then what, in your opinion, was the reasonable, probable cause of the signal device to begin working? A. You could go over to that box and vibrate that case and cause the relay to make contact.

"Q. Would that be what you would call a slow acting relay? A. Yes, or delayed action.

"Q. Then vibration could cause it to drop? A. Yes, sir, more so on a self-dropping relay than one pulled together with magnetic force of some kind.

"Q. Assuming that the truck of Mr. Pettit, weighing approximately 40,000 pounds, collided with this tank car and derailed this tank car, and that this case was sixteen feet from the left rail, is it your opinion that such a vibration could have caused the sticking relays to have dropped and started the lights working? A. Yes.

"Q. Could a man have caused sufficient vibration by running over there and kicking on it, to cause the lights to start working? A. Yes, sir. Any kind of vibration could cause them to come back on.

"Q. This whole set up, Mr. Young, is mechanical and electrical? A. Yes, sir.

"Q. As an expert, will you tell this jury if anything electrical or mechanical won't fail at times? A. I have never seen anything made by man that didn't fail at times.

"Q. You see all kinds of electrical failures. You never know what you are going to run up against? A. That's right."

On cross examination this witness testified as follows:

"Q. Is it your testimony that somebody could go over there and kick that box and cause it to work? A. Yes, sir.

"Q. You don't know if it sets on a solid device? A. No, sir, but I still say vibration could cause it to work, and it don't take much vibration.

"Q. Would you say that a foreign matter got in that case in twelve or fourteen hours? A. I didn't say it got in there. It is sealed up, but it could have gotten in there. It could be in your case."

The jury had before it the testimony of C. O. Billingslea, Signal Supervisor of the railroad, who testified that he didn't take the position that these signals were infallible and that it was possible for conditions to exist whereby they will not operate with the train on there.

Finally, the jury had before it the testimony of Mr. Howard A. Thompson of Pittsburgh, Pennsylvania, witness for the railroad, Consulting Engineer for the Union Switch & Signal Co. On cross examination he was asked a hypothetical question embracing the testimony of witnesses, Seth Kay, L. A. Halton, J. L. Brock, Bob Lawrence and W. R. Oakley with respect to their experiences at this crossing, which question concluded:

"Q. Now, will you, as an expert, turn and face this jury and tell them if the signal was properly maintained? A. If that happened, they certainly were not properly maintained."

The engineer, Jacobs, who was at the controls of the train, testified that he was familiar with the flasher signals that controlled traffic on Highway 90 at the east leg of the wye and that he had observed them to see if they were working before he approached the crossing; that after the collision he put fusees out to the rear of the truck and also on the west side of the track. He testified further that he knew that people know about the signal lights there and they come up there expecting to find lights so he took the precaution every time he approached there to look to see if the lights were working so if the lights were not working they could light a fusee and drop on the crossing as he had done at this crossing on other occasions. He also testified that it was the duty of every member of the train crew to stop the train when anything unusual occurs at the track that might create danger; that when the engine hits the contact point about 250 feet north of the crossing the lights are supposed to come on, and after the engine reached the crossing, he had plenty of time within which to stop the engine and the train before the engine got to the crossing, if the lights and signals were not working and to put out fusees, flares, and have a flagman posted there. Other members of the train crew also testified that if the lights were not working they would have known about it in plenty of time to have stopped the train.

Brakeman Marshall testified that he had been in a position to tell whether the lights were working or not working before this collision.

Conductor Alford testified that before the accident he had looked to see whether the signal lights were working. He also testified that from where he was before the collision if the lights had been working properly he could plainly see them; that they put no watchman out at the crossing before the collision; that they didn't put out fusees at the crossing before the collision; that they carried fusees on the engine; that the train was going slowly and could have been stopped within the 257 feet between the activating point of the

signals on the track and the highway; that when any emergency arises it is the duty of any member of the train to stop the train.

Fireman Staha testified that he was seated in the cab of the engine and as he came down the track before getting to Highway 90 he noticed the signal lights at the crossing. He testified further that he had plenty of time as he was going south toward the crossing to have given the engineer a stop signal before getting to the crossing if the lights had not been working; that it is the duty of every crew member, if they see anything out of the ordinary to stop; that there was plenty of time, after he could see the lights, to have stopped the engine and put out fusees or flares and placed a watchman there on the crossing.

Brakeman Marshall testified that he dropped off the train roughly 150 feet north of Highway 90; that when he got off the train he was able to look down at the crossing and see the signal lights on Highway 90 and that he looked at the signal lights. He also testified that if the lights are properly working they start working before the engine gets to the highway something about 200 or 250 feet; that before the engine got to the highway he could see the lights at the crossing; that the train was moving at a speed of 4 or 5 miles an hour; that he could have given a stop signal before the engine got to the highway; that it was the duty of every member of the train crew when seeing something out of the ordinary to stop the train; that he did not give any signal to stop the train before the train proceeded to cross the crossing that night; that no fusees were placed at the crossing before the collision; that by stopping the train he could have walked to the crossing and watched the crossing.

Rear brakeman Pendleton testified that from the point where he was, he was in a position to see the signal lights on Highway 90. He also testified that if he observed anything which caused an extra hazardous or dangerous situation he would have the authority to give stop signals; that he was in a position to look down at the crossing and see the lights and had seen them in plenty of time, if he had desired to have given a stop signal and stopped the train; that he had seen the lights in plenty of time to stop the train and put out a watchman and put out flares or fusees; that there were no flares or fusees on the crossing before the collision and there was no watchman there at the time.

We have concluded that the above evidence presented a sharp conflict, and that the finding of the jury that the lights were not working at the time and shortly before the time of the collision finds support in the evidence. The appellee himself testified that the lights were not burning and the signals were not working. The other circumstances in evidence corroborate his testimony. At the time when Pettit was pinned in the cab of his truck, badly injured and in severe pain, he inquired of one of the train crew "Why don't they put lights on these tracks." The testimony of the brakeman Marshall, by deposition, was that when his attention was first attracted to the truck headed toward the crossing, he ran toward the crossing waiving his light and "hollering". Testimony of other witnesses was that on three occasions in the Fall of 1950, once 15 days prior to this collision, at the east leg of the wye, once about 3 weeks or 30 days after the collision at the west leg of the wye and 60 days after the collision at the east leg of the wye, these flasher signals were not operating while trains were crossing. The records of the railroad company showed that for 11 years no accident occurred at this crossing, but three accidents occurred there in the Fall of 1950. According to appellant's records the batteries in the signal case of this device were repaired on July 20, 1950, after a car had struck the signal case. They were returned on October 20, 1950. We think these corroborating circumstances in the evidence were sufficient to raise a fact issue for the jury to determine, and the appellant's contention to the contrary is overruled.

As to the appellant's sub-points 1–B and 1–C, under its Point No. 1, we think the

evidence is sufficient to support the finding of negligence. The most difficult question to determine is whether the evidence is sufficient to support the finding that the signal lights were not working. If the lights were not working, and the finding that they were not will not be disturbed, then the evidence is ample that the various members of the train crew were in position to observe the highway and the signal lights as the train pulled across the highway on the east leg of the wye. Practically all members of the crew, as it will be observed from the reading of their testimony set out above, were watching and observing at different locations along the length of the train. The track on which they were moving their train was on a curve at that point, making a leg of the wye, and the members of the crew could see the lights and the signal device before the train got to the crossing, and they had time to stop the train if the lights were not working.

As we have stated above, the hub of this controversy is to be found in the question whether the signal lights were working or not. If the signals were operating, then Pettit's act in driving his truck into the train while signal lights were operating would have been inexcusable and would have barred him from recovery. On the other hand, if the flasher lights and signals were not operating there, the evidence shows that the train crew had ample opportunity to observe this failure in time to place flares or signalmen on the highway or to stop the train before it reached the highway, either or all of them, in time to warn traffic on Highway 90.

We think the evidence is sufficient to support the findings of the jury as to negligence, and the court did not err in denying the appellant's motion for judgment non obstante veredicto.

By its second point the appellant contends that Pettit was guilty of contributory negligence as a matter of law in that the physical facts show that he was driving at a speed in excess of 30 miles per hour, that had he been driving at a speed less than 30 miles per hour he could have seen the train in time to stop; that the undisputed testimony shows that Pettit was driving at a speed whereby he could not stop in the range of his vision, and that the evidence conclusively established that Pettit failed to keep a proper lookout. The appellant points out that Pettit testified that he did not see the train blocking the crossing until he was within 50 or 60 feet of it, that he was looking straight down the highway and that he did not see the tank car until he raised his lights. An expert witness who had made a study of braking distances as applied to motor vehicles testified and introduced a chart in evidence from which he testified that a person driving a car at 30 miles per hour could have stopped his car within the 60 feet after he started to put on his brakes. The appellant argues here that if Pettit had been driving at 30 miles an hour or less he could have stopped his truck and he could have seen the train in time to have stopped; that he was driving his vehicle at a speed at which he could not have stopped his truck in the range of his vision while his lights were dim. In answer to these contentions, the appellee points out that when Pettit passed the last blinker lights at the intersection of Highway 90 and the Dayton-Cleveland Road, he was not going over 3 to 5 miles per hour. He drove on west building up speed, and when he first saw the tank car across the highway he was not going over 30 miles an hour when he was 50 or 60 feet from the tank car. The lights in the town of Dayton were burning, bright illuminating lights, and he put his lights on dim when he came up on the top of the hill on the east side of the town. With them on dim, they would reflect on the pavement ahead of him about 100 feet, and on dim the lights were sloped down and set to shine on the right hand side of the pavement, with the main part of the light extending out about 100 to 125 feet ahead. The highway was black and the tank car that he collided with was black, and there was no substantial difference in color between the two. The Valley Courts was just 100 feet west of the track, and south of Highway 90, and had a bright neon light in the front thereof. It was a dark night and the moon was not shining

or out. After leaving the Valley Courts, there are no more street or building lights before you get to the railroad track. The area in front of the Valley Courts was also lit up, and after one passed this neon light going west, one goes from an area of light into an area of utter darkness about 100 feet east of the tracks. Another truck driver, the defendant's witness Ogg, who was behind Pettit, and who drove this highway 4 or 5 times a week, at night, stated that he knew from his experience that if the flasher lights were not working, he could not under any circumstances see a black tank car on the crossing until he was as close as 75 feet of the crossing. This truck driver also said that he always drove through the town of Dayton with his lights on dim.

The railroad crossing at the east leg of the wye is right in a curve, which begins about 300 feet east of the crossing, curving first to the right and then back to the left, just as it crosses the track.

After Pettit passed the Valley Courts, and the bright illuminated area and entered the area of utter darkness, he raised his lights to bright, and for the first time discovered the black tank car in front of him across the highway. Whereupon, he applied all of his brakes and pulled to the left because there was what appeared to him to be a ditch to his right. The wheels of the north trucks of the tank car were off the pavement on the north side and the south ones were on the south edge of the pavement. The tank car between the wheels, was between 36 and 40 inches above the surface of the highway. When he raised his lights from dim to bright, they reflected on the bottom of the tank car. Before that, on dim, they were reflecting on the pavement. As he was approaching the crossing, he continued to look ahead of him. Pettit testified that he didn't see the tank car sooner, blocking the crossing because his lights on dim slope down, set to shine on the right hand side of the pavement; that the main part of the lights extend out 100 to 125 feet; that the lights would shine under the tank car, and wouldn't shine on the wheels over there on the right side, being off of the pavement; that the tank car and pavement were both black, and blended together and the beam of light would not catch the wheels.

Besides, as Pettit approached there, and before the collision, he observed a glow in the sky over the main line track in the west, and he took it to be a train he was meeting on the main line track. One of defendant's train crew saw a train come along the main line a little after the collision. The flasher lights of the defendant, the lights that spelled "STOP" and the bells were not working, and there were no lights there at the crossing. Pettit had crossed this crossing hundreds of times before. He knew that this flasher and stop lights were there at the crossing, and that they had been there for a long time. He had driven a truck for 37 years all over East Texas, and has had occasions to cross crossings in that area that had flasher lighting crossing systems like the ones in question many times, and observed the systems and had had an occasion to approach such crossing served by such systems where trains were across the crossing, whether standing or moving, on many occasions, and observed the systems working and could observe a train across the crossing with the flashers working from 500 to 600 feet if the lights were working. But he had never seen a train across the crossing at Dayton before.

In view of this experience at other crossing, served with this type of flasher signalling devices, knowing this system was here at Dayton, and on the occasion as he approached the crossing, since the system was not operating and not working, and the flashers and lights were not working, he was not expecting a train to be across the crossing, and he was expecting the lights to be working if there was a train across the crossing, and he was relying upon the lights to be working if there was a train across the crossing and the lights not working, he didn't expect the train to be across the crossing.

If the lights had been working there that night, he could have seen them 500 to 600

feet from the crossing, and could have safely stopped.

The engineer testified that he had been working on this line since 1919, and he knew that the people knew that the signal lights were there, and they came up there to the crossing expecting to find lights when there was a train across the crossing.

The witness, Ogg, testified that he always depended upon these lights there at the crossing to warn him of a train across the crossing. He knew the lights were there and always depended upon these lights. Driving through Dayton 4 or 5 nights a week for 5 years, when he approached the crossing, he always watched for these signal lights to give warning whether a train was on the track; that the big neon sign at Valley Courts is just east of the crossing, and that area was all lighted up and after you pass this light, you would go into utter darkness, and that he knew from experience that if the flasher lights were not working, you could not under those circumstances see a tank car on the crossing until you got within 75 feet of it.

Other disinterested witnesses who had had near fatal experiences at this crossing when there was a train across the track, and the flasher system was not working, testified. Seth Kay, the Constable, testified that he had had such an experience shortly before and shortly after the Pettit wreck, and that one time he was within 60 feet of the train before he saw it with his lights on.

Bob Lawrence testified that he was within 75 feet of the train across the crossing when the flasher lights were not working before he saw the train across the crossing.

W. R. Oakley testified that he was from 45 to 50 feet from the crossing before he saw the train stopped across the crossing and the flashers were not working, and he stopped within 15 feet of the crossing.

On the north side of the highway are located trees, brush and billboard signs that partially block the view from the highway of trains on the track to the north of the highway, even in the daytime.

From the above summary of the evidence we do not believe that it could be said as a matter of law that appellee Pettit was guilty of contributory negligence as a matter of law. The general rule is that contributory negligence is a question of fact. Where some care is exercised by a plaintiff for his own safety the sufficiency of such care is a question of fact. We think that the showing that Pettit was driving with his lights on dim while going through the town of Dayton and kept the lights on dim until he reached the western outskirts of the town where the east leg of the wye track was located, was perfectly normal under the circumstances, and the jury was authorized to consider them in passing upon the question whether he was driving too fast or failed to keep a proper lookout for his own safety.

The appellant's third point complains of the trial court's refusal to submit its requested issues as to Pettit's negligence in driving with his lights on low or dimmed. It requested the following issue:

"Do you find from a preponderance of the evidence that as the plaintiff, John Dixon Pettit, was approaching the east leg of the wye at Dayton, and shortly before the collision occurred, he was operating his truck with his lights so aimed and adjusted that they were not of sufficient intensity to reveal the tank car situated across the highway, a distance of at least one hundred (100) feet ahead?"

It says that it was entitled to have it submitted as one of its affirmative defenses. The court submitted its Special Issue No. 17 in its charge, which read as follows: "Do you find from a preponderance of the evidence that the plaintiff, John Dixon Pettit, as he approached the tank car on the east leg of the wye at Dayton was operating his truck at an excessive rate of speed under the facts and circumstances then and there obtaining?" The court also submitted the following as its Special Is-

sue No. 20 in the court's charge: "Do you find from a preponderance of the evidence that the said John Dixon Pettit, at the time of and just prior to the collision, failed to keep a proper lookout for the train then occupying the crossing?" The Special Requested Issue No. 1, quoted above, was not accompanied by a request for any issue contingent thereon, inquiring if such an act was negligence and a proximate cause. The appellant contends that an affirmative answer to the requested issue would have constituted a complete defense to the lawsuit. We do not agree. In the first place, we believe that the two issues submitted by the court, quoted above, Nos. 17 and 20, included the matter sought to be inquired about by the requested issues refused by the court. We think it is established that the submission of the proper issues to the jury on proper lookout and excessive speed does not require that the court also submit the issue of proper control of a car. Triangle Cab Co. v. Taylor, 144 Tex. 568, 192 S.W.2d 143. We also believe that it is following the same pattern to hold that, under the facts as are outlined above in this case, when the court submits issues on excessive speed and proper lookout, it is not error to refuse the requested issue here as to whether he was operating his truck with his lights so low that they failed to reveal a tank car on the highway at least a hundred feet ahead. This did not present an ultimate issue of fact here. The question of Pettit's operating his truck with his lights dimmed too low was encompassed in both the issues inquiring as to excessive speed and proper lookout. This point presents no reversible error and it is overruled.

This brings us to the appellant's fourth point, which, in our opinion, included the second basic question to be decided in this lawsuit. (The first was whether the warning signal device was working.) Under this point the appellant presents its contention that the facts show conclusively that appellee Pettit, in driving his truck into the tank car stopped on Highway 90, did so in violation of Section 86, Article 6701d, Rev.Civ.Stats. It quotes and relies on the following portion of the statute:

"Whenever any person driving a vehicle approaches a railroad grade crossing, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall not proceed until he can do so safely when:

(a) A clearly visible electrical or mechanical signal device gives warning of the immediate approach of the train."

Sub-section (d) was also plead:

"(d) An approaching train is plainly visible and is in hazardous proximity to such crossing."

Under this point the appellant points out that it specifically pleaded the above statute. It says that unquestionably the train was in hazaradous proximity to the crossing and by reason of its nearness to the crossing was an immediate hazard. It says the statute was plainly applicable and therefore it tendered requested issues Nos. 3, 4, 5, and 6.

Special Requested Issue No. 3 sought to inquire whether the tank car situated upon the east leg of the wye, and partly across U. S. Highway 90 as Pettit approached the wye, was plainly visible and in hazardous proximity to such crossing. No. 4 was contingent upon an affirmative answer to No. 3 and sought to inquire whether the failure of Pettit to stop his truck within 50 feet, but not less than 15 feet, from the east rail of the wye was a proximate cause of the collision. No. 5 sought to inquire whether a clearly visible electrical signal light gave warning to Pettit that the east leg of the wye was occupied by the tank car. No. 6, based on an affirmative answer to No. 5, sought to inquire whether the failure of Pettit to stop his truck within 50 feet but not less than 15 feet from the wye was a proximate cause of the accident. As to requested issues Nos. 5 and 6, we think the court submitted in its charge, in Special Issue No. 2, the question whether the elec-

trical warning devices at the crossing in question were working, and it was therefore not error to refuse the requested issue No. 5 and requested issue No. 6 contingent upon the answer to No. 5.

■ The main question under this point is whether the quoted statute applies to the facts in evidence in this case. We have examined the cases and authorities relied on by the appellant. Zamora v. Thompson, Tex.Civ.App., 250 S.W.2d 626; Texas & N. O. R. Co. v. Stewart, Tex.Civ.App., 248 S.W.2d 177; Lackey v. Gulf C. & S. F. Ry. Co., Tex.Civ.App., 225 S.W.2d 630; Larson v. Missouri K. & T. R. Co., Tex. Civ.App., 254 S.W.2d 215; Peters v. Chicago R. I. & P. R. Co., Tex.Civ.App., 257 S.W.2d 860; Panhandle & S. F. Ry. Co. v. Karr, Tex.Civ.App., 257 S.W.2d 486; Karr v. Panhandle & S. F. R. Co., Tex., 262 S.W.2d 925. We have also read the later case of Port Terminal Ry. Association v. Noland, Tex.Civ.App., 288 S.W.2d 276, which also deals with a crossing collision in which said Article 6701d, Sec. 86, was pleaded and relied on as a defense. From all of these authorities we are convinced that the statute is not applicable here, since the appellant's train and tank car were not "an approaching train", but the tank car was stopped across the highway. It is undisputed that Pettit did not stop his truck and the tank car was across the highway. The ultimate and controlling issue here then was whether Pettit's failure to stop was negligence under the facts and circumstances surrounding his approach to the crossing, and whether such negligence, if any, was a proximate cause of the collision. Such issues were submitted by the court in its charge and the jury found, in answer thereto, that Pettit's failure to stop was not negligence. We find no error presented under this point and it is overruled.

■ Appellant's fifth point complains of the trial court's action in permitting a witness for the appellee to give expert opinion evidence in regard to the electrical warning devices and their operation and functioning. Appellant examined the witness as to his qualifications as an expert and objected to opinion evidence by him on the ground that he was not qualified. The witness Young testified that he was an electrician engaged in electrical contracting with 13 years experience as an electrician. He was trained in an electrical school in the Coast Guard in 1942 with 14 months of schooling. Thereafter he had charge of a maintenance crew in the maintenance of electric guns and all parts, motors, relays and electrical equipment in connection therewith. He worked as an electrician for Todd Shipyards for 4 months; Gulf States Utilities Company 4 years; Texas Gulf Sulphur Company for 3 years. He had studied a blue print of the flasher type electrical devices in use at the crossing in suit and was familiar with the drawings and principles on which it works. On examination by appellant he testified that he had never had any connection with the supervision or installation of railroad flasher devices and never had inspected them, had never looked inside of one of the cases and never had any experience in the operation or repair of them, and had had no special study of railroad crossing devices. The trial court overruled appellant's objection and allowed him to testify as an expert. The general rule is that the competency of an expert witness must be left to the determination of the trial court in his discretion. We quote the following from an opinion in U. S. Fidelity & Guaranty Co. v. Rochester, Tex.Civ.App., 281 S.W. 306, 311:

"It is well settled that in certain classes of questions involving peculiar skill, science, or knowledge, witnesses possessing such skill, science, or knowledge may testify as experts, not only to the facts, but to their opinions respecting the facts so far as necessary to enlighten the jury and to enable them to come to a right verdict. It is said that it is not necessary in this day to draw any nice distinctions between the various definitions of the word 'expert.' It has been said to mean one 'instructed by experience,' 'a man of science,' 'a person of skill,' 'an experienced person,' 'a person possessed of some peculiar science or skill.' See 2 Jones, Blue Book on Evidence, §§ 267, 268. In the

latter section, among other things, it is said: 'To entitle a witness to answer as an expert, it is true "he must, in the opinion of the court, have special acquaintance with the immediate line of inquiry, yet he need not be thoroughly acquainted with the differentia of the specific specialty under consideration. If this were necessary, few experts could be admitted to testify; certainly no courts could be found capable of determining whether such experts were competent. A general knowledge of the department to which the specialty belongs would seem to be sufficient." The value of the testimony is enhanced or depreciated according to the experience or study of the witness.' "

We do not think it could be required of the witness, in order to qualify as an expert witness, that he had experience and knowledge and training in regard to the particular signal device which the appellant had at the crossing near Dayton. The testimony as to his training, experience and knowledge of electricity and electrically operated machines and contrivances showed that he had a special professional knowledge which the members of the jury did not have, and he was competent to testify as to the workings and operation of the appellant's warning devices. This point is overruled.

Under its sixth and last point the appellant says that the verdict of the jury was excessive, and that $50,000 allowed Pettit for his injuries should not be allowed to stand. They rely upon Missouri K. & T. Ry. Co. v. Webb, Tex.Civ.App., 229 S.W.2d 204. Pettit undoubtedly received severe injuries and suffered a great deal of pain. At the time of his injuries he was 54 years old, employed as a truck driver, earning $60 per week, plus an additional $27 per week for room allowance and gasoline discounts. It was shown that he had a life expectancy then of 18 years and by the time he reached the age of 65 he would have earned $48,664. His injuries and pain and suffering were severe. Pettit was pinned in the cab of his truck, fully conscious with severe mangled, comminuted fractures of both legs and right ankle, fractures of the knee cap of the left leg. He was in his cab for over an hour, enduring horrible pain. He suffered so that he begged the train crew to kill him. He was confined in the hospital in Dayton until November 7, 1950, whereupon he was transferred to the Methodist Hospital in Houston, Texas, where he remained until March 8, 1951, undergoing several operations, skin grafts and bone grafts, and continuing to suffer severe physical pain and mental anguish. He was readmitted to the hospital on April 5, 1951 and remained there until April 28, 1951. He was again readmitted on June 8, 1951 and discharged June 15, 1951, and readmitted August 11, 1951 and discharged September 8, 1951, and readmitted December 27, 1951 and remained until January 5, 1952. He has since then returned periodically to his doctor's office in Houston, and the last time before the trial the doctor saw him on January 11, 1954. He still wears screws in his legs and he has to wear specially built steel braces, specially built shoes, and uses a cane in order to walk at all. He reached maximum recovery on January 11, 1954, and his injuries are such as to cause him severe physical pain and mental suffering for the balance of his life. Pettit's injuries are permanent and he is permanently and totally disabled. We do not feel that the jury's calculations and finding as to Pettit's financial damages should be disturbed by this court in view of all of the above facts, and this point is overruled.

The judgment of the trial court is affirmed.