**Helen H. BULLOCK and Grover C. Bullock, Appellants,**

v.

**TAMIAMI TRAIL TOURS, INC., Appellee.**

No. 17461.

United States Court of Appeals Fifth Circuit.

April 20, 1959.

---

Victor M. Cawthon, Tallahassee, Fla., for appellants.

Chas. H. Spitz, A. Frank O'Kelley, J. Velma Keen, Tallahassee, Fla. (Keen,

O'Kelley & Spitz, Tallahassee, Fla., on the brief), for appellee.

Before RIVES and TUTTLE, Circuit Judges, and SIMPSON, District Judge.

RIVES, Circuit Judge.

The appellants are Negroes, British subjects, natives of Jamaica, married to each other, and in their early fifties. For more than twenty years the husband has been a minister of the Church of England. The wife is a musician and teacher. Racial segregation is not practiced in the island of Jamaica.

Prior to 1956, the appellants had left that island on only one trip and that was to European countries and South American countries which did not segregate the races. They were not familiar with the racial segregation practiced in the Southern part of the United States.

In August 1956, they decided to make an extended visit to the United States, landing in Miami and going by bus first to Kansas City and then to New York. They made arrangements for the trip through the Mountain Travel Service before leaving Jamaica and bought tickets over the appellee's bus line. When the bus arrived in Perry, Florida, they were sitting together in the forward part of the bus usually occupied by white passengers. The husband was dark or black, while the wife, though a Negress, appeared to be a white woman.

At Perry, Florida, one Milton Poppell entered the bus and violently assaulted and beat the husband and slapped the wife. The circumstances are well described in the testimony of Poppell, quoted in the margin.[1] Other evidentiary

1. "Q. Mr. Poppell did you go on a bus in Perry and assault this man right here? A. Yes, I did.

"Q. Did you know he was on that bus before you went on there? A. Well, yes, I did.

"Q. Is that the reason you went on the bus? A. Well, not exactly.

"Q. Where were you going on that trip? A. I have got a farm out this side of Perry.

"Q. About how far is it? A. Approximately ten miles, maybe twelve.

\* \* \* \* \*

"Q. Mr. Poppell, how did you know that the Reverend Bullock was on that bus? A. Well, the police and I were sitting down there drinking coffee and I overheard the conversation of the bus driver telling the police that they were on there. He didn't say they were on there, he said, talking to them, 'fellows look what I have got to contend with and nothing I can do about it.' And the police says, 'our hands are tied too.'

"Q. He told that to the police officers? A. The best I remember that was the words said.

"Q. You heard—how far away were you? A. Well, I was sitting down there at the table.

"Q. At the table with the police officers? A. Yes, I was.

"Q. Then what did you say? A. I didn't say anything right then. In a few minutes I got up and asked if I could buy a ticket on the bus.

"Q. You asked the bus driver that? A. Yes.

"Q. Then what did he say? A. He said he had them for sale.

"Q. Mr. Poppell have you got anything against colored people, generally? A. Not as long as they stay in their place.

"Q. Well, why did you assault him? A. Because he was out of his place.

"Q. How did you know he was out of his place? The bus wasn't full then, was it? A. Not at that time, it wasn't, but when everybody got on it was full. Whenever I got on it wasn't full.

"Q. How do you know it wasn't full? A. Well, there was plenty of loading space in the rear of the bus, but there wasn't any in the front.

"Q. Did anything the bus driver say lead you to believe he wasn't in his place? A. Well, I don't know whether you would figure it was what the bus driver said or what I felt that he was out of his place too.

\* \* \* \* \*

"Q. Isn't it true that you wouldn't have known, Mr. Poppell, about the Bullocks being on the bus if it had not been for the bus driver? A. Well, I probably wouldn't have noticed it.

"Q. Then if you hadn't noticed it, you would not have gotten on the bus, isn't that right? A. Well, I couldn't say whether I would or wouldn't, because I just really don't know whether I would have gotten on there or not. My in-

facts are stated in some detail in the opinion of the district court reported in 162 F.Supp. at page 203 et seq.

After reaching New York, the appellants brought suit against the appellee in a New York State Court, claiming that the appellee had breached the duties owed to them as passengers by omitting to warn them of a foreseeable danger, by failing to protect them from that danger, and by willfully, or at least negligently, aggravating the danger. The appellee, incorporated under the laws of Florida, being sued by citizens and subjects of

tention was not getting on there but then I decided to go.

"Q. At the time you heard the bus driver speaking you had no intention of getting on that bus, and you had your car didn't you? A. Yes, I did. I reckon I did. Yes, I did.

"Q. And when you heard the bus driver say something then you decided to get on the bus, isn't that right? A. Yes, that helped.

\* \* \* \* \*

"Q. Mr. Poppell in your testimony in this court yesterday, you stated that you had nothing against colored people? A. that's right.

"Q. You added that if they kept their place? A. That's right.

"Q. Did you attack the Reverend Bullock simply from the fact he was seated on the bus? A. Well, yes. And I wanted to see and as a matter of fact he was with a white woman.

"Q. What do you mean, with a white woman? A. Well, his wife is supposed to be white, I understand.

"Q. How did you know who his wife was? Had you ever known the Bullocks before this? A. No.

"Q. How did you know who his wife was? A. Well, she was pointed out as she came in the bus station.

"Q. Was it the bus driver that pointed her out? A. I believe he made a remark to the policeman that that was his wife coming in.

\* \* \* \* \*

"Q. How did you happen to hear this? A. Well, I was sitting with the policemen.

"Q. With the policemen? A. Yes, sir.

"Q. How far were you from the bus driver? A. Well, it is just like the table in the restaurant, I was sitting down at one end of it and one of the policemen was sitting on the opposite side and one on this side. And the bus driver walked up to the table.

"Q. And he spoke to the policemen? A. Yes.

"Q. And what did he say, Mr. Powell (sic), again? A. I believe he says, 'and that is his wife there.'

"Q. And he pointed out Mrs. Bullock? A. Yes.

"Q. And she appeared to you to be white at that time? A. Yes, she did.

"Q. Did he say anything about the man on the bus being married to a white woman? A. I don't remember.

"Q. Maybe this will refresh your recollection—did he say the man on the bus was married to a white woman? A. I believe he did.

"Q. Did you hear it? A. Yes.

"Q. How far away were you from him? A. Well, he was standing at the head of the table and I was sitting down.

"Q. Now, of the two things, which do you think is the worse, in your opinion—

\* \* \* \* \*

"A. Well, that's about fifty-fifty proposition.

"Q. You mean you don't like either one? A. Either one. Otherwise he was out of his place in my opinion in the front of the bus and he was certainly out of his place being married to a white woman.

"Q. Mr. Poppell when you went in there and asked him to move you didn't give him a chance to move? A. Well, I expected a fight back so I didn't give him too much a chance.

"Q. Why did you expect a fight back? A. I didn't figure he was going to give up his seat.

"Q. Why did you figure that he wouldn't give up the seat? A. Well, just a matter of my opinion.

"Q. Is it a practice that all colored people in Perry have to move back? A. Yes.

"Q. Why did you expect this to be any different? A. Well, I guess by him riding so far without any trouble.

"Q. Actually didn't you know that he had been asked to move? A. Yes, I did.

"Q. How did you find that out? A. I believe that the bus driver made the statement.

"Q. Now, is it your testimony that everything you knew about this man came from the bus driver or was there anyone else who told you anything about it? A. No, it wasn't discussed. The bus driver didn't tell me anything at all and it wasn't discussed with anybody else. All I knew was what I overheard."

Great Britain, had the case removed to the United States District Court for the Eastern District of New York.[2] That Court transferred the action to the United States District Court for the Northern District of Florida.[3]

There the case was tried to the court without a jury. After fairly finding the evidentiary facts in a manner to which the appellants take only minor exceptions, the district court entered judgment for the defendant, feeling that the law of the State of Florida required it to do so, and said in part:

> "In Hall v. Seaboard Air Line Ry. Co., 84 Fla. 9, 93 So. 151, the Florida Supreme Court held that a carrier was not liable to a passenger for an unprovoked and illegal assault in cases such as this case. Without regard to the views of this Court as to what the law should be in such a case as this the decision of this Court is completely controlled by the decision of the Supreme Court of Florida in the case cited above.

> "Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188."

Bullock v. Tamiami Trail Tours, D.C. N.D.Fla.1958, 162 F.Supp. 203, 205.

█ We are not in agreement with the district court either as to the Florida law or as to the ultimate facts, inferences or conclusions of duty and breach of duty on the part of the appellant carrier. In so far as those ultimate facts are simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, they are subject to review by this Court free from the restraining influence of the "clearly erroneous" rule, Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A.; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219. To the extent that the inference of negligence is controlled by Rule 52(a), supra, this Court, on the entire evidence, "is left with the definite and firm conviction that

a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746.

In Hall v. Seaboard Air Line Ry. Co., 84 Fla. 9, 93 So. 151, the case relied upon by the district court as dispositive of the case at bar, a female passenger was assaulted by a male passenger in a Pullman berth, they being the only two occupants of the car. Holding that the plaintiff's proof failed to support her allegations that a porter and conductor heard her calls and bells in time to have prevented the assault, the court stated:

> "The liability of the carrier in such case rests, not upon the tort of the passenger, but upon the negligent omission of the carrier through its servants to prevent the tort being committed. A failure to do anything which could have been done by the servant to prevent the injury renders the carrier liable. But to do something to prevent an injury resulting from an assault by a fellow passenger implies knowledge on the part of the servant that the act is contemplated by the stranger, or by due diligence the servant could have obtained such knowledge, or had the opportunity to acquire it sufficiently long in advance of its infliction to have prevented it with the force at his command. 4 R.C.L. 1185.

> "In guarding a passenger from a danger which is not usual or not incident to ordinary travel the carrier is held to the use of ordinary and reasonable care and diligence. It is the failure of the carrier through its agents to afford the required protection, after they had reasonable grounds for believing that violence or the insult was imminent, upon which the liability of the carrier rests. It is not the fact of injury to the passenger that fixes the carrier's liability. The injury must have been of such character and inflicted under such circumstances as that it might

---

**2.** Under 28 U.S.C.A. §§ 1441, 1332.

**3.** Under 28 U.S.C.A. § 1404.

have been *reasonably anticipated or naturally expected to occur."* (Italics supplied.) 93 So. at pages 156–157.

In Kenan v. Houstoun, 1952, 150 Fla. 357, 7 So.2d 837, 838, where, after alighting from the Florida East Coast train, plaintiff was struck on the legs by an ejection of steam from a nearby L&N train causing her to move about rapidly and fall over baggage, the court, in quashing a judgment against the Florida East Coast Railway, stated:

"* * * When it appears that the agency which caused the injury was other than defendant or its agents the plaintiff must prove that defendant knew or by the exercise of ordinary care could have known of it in time to remove the cause of the injury. 10 Am.Jur. 173, Chesapeake & O. Ry. Co. v. Burton, 4 Cir., 50 F.2d 730, 731.

"It is settled law that under the facts stated the Florida East Coast was bound to furnish Mrs. Houstoun reasonably safe facilities for leaving the train and to remain in the station but unless said company or its agents were in some way responsible or could have foreseen and prevented the accident, it cannot be held responsible for injury caused by the negligent act of a third person. In this case, the L. and N. Railway was the third person and we think was responsible for the accident. It was in no way attributable to the negligence of petitioner nor do we know of any criterion by which it could have been put on notice of it. It had not happened before and the character of it was of such a nature that it could not have been *reasonably foreseen."* (Italics supplied.)

▉ Therefore, in Hall v. Seaboard Air Line Ry. Co. and Kenan v. Houstoun,

supra, the rule may be generally stated that a carrier is liable for injury to its passenger caused by a fellow passenger or a third party if such injury by its nature could have been "reasonably anticipated" or "naturally expected to occur" or "reasonably foreseen" in time to have prevented the injury. [84 Fla. 9, 93 So. 157.] If the injury could have been reasonably anticipated in time to have prevented its occurrence, the carrier is subjected to the highest degree of care to its passenger either to protect him from or to warn him of the danger.[4]

It was impossible for the driver to have protected the Bullocks from Poppell's assault after his intent became evident, but we think that the district court was clearly erroneous in holding that Tamiami could not have reasonably anticipated or foreseen the danger to the Bullocks in time to have at least warned them of its imminence. We can visualize no stronger case than this to show a situation where two bus drivers and the bus company officials should have reasonably anticipated that mischief was hovering about and that the Bullocks were in some danger.

The first driver testified that many people in West Florida would not approve of the Bullocks' being seated together toward the front of the bus. Driver Cunningham stated that there would have been less chance of trouble if the Bullocks had been sitting in the back. The first driver, after explaining to a complaining passenger that he could not move the Bullocks, heard another passenger say something like "they probably will move on down the line." Both drivers had actual notice of the two Company bulletins dated January 31, 1953, and January 23, 1956, the latter plainly warning the drivers of possible racial disturbances.[5] Certainly, the first driver

---

4. See, 10 Am.Jur., Carriers, §§ 1453–1470; 13 C.J.S. Carriers §§ 695, 696; Annotations, 15 A.L.R. 868; 42 A.L.R. 168; 43 A.L.R. 1035; A.L.I., Restatement of Torts, § 348. The duty to warn is identical to the duty to protect. See Rose

v. City of Chicago, 317 Ill.App. 1, 45 N.E.2d 717.

5. "Under No Circumstances Shall Police Authorities Be Summoned If A Passenger Refuses A Seating Or Reseating Re-

and, no doubt, Cunningham knew the Bullocks were Jamaicans and British Nationals, and it is logical to infer that the drivers knew the Bullocks were not experienced with "southern tradition." All of the appellee's witnesses testified that this was the first instance they knew of in that part of the country where a Negro man and a seemingly white woman were seated together on a public carrier.

■ Furthermore, this Court will take judicial notice (as the district court should have done) of the commonly and generally known fact that the folkways prevalent in Taylor County, Florida, the county seat being Perry, would cause a reasonable man, familiar with local customs, to anticipate that violence might result if a Negro man and a seemingly white woman should ride into the county seated together toward the front of an interurban bus.[6]

■■ The next question is whether or not Tamiami, so charged with a duty of foreseeing danger to its passengers, took proper precautions to avoid such danger by the "utmost care and diligence of very cautious persons."[7] We think that Tamiami failed to exercise this care in several ways. It should have instructed its agency in Jamaica to. advise Negroes applying for passage through the southern part of the United States of the South's tradition of segregation.. It should have instructed its driver to advise Negroes who were obviously foreigners, here known to be such, of segregation customs. The driver should have explained to the Bullocks his reasons for wanting them to move. Above all, the driver should not, either willfully or negligently, have informed the assailant of the Bullocks' position on the bus and of their apparent color and lack of color.

The district court found, at least impliedly, that Tamiami was not guilty of any willful or aggravated misconduct justifying the imposition of punitive damages, and to that extent its finding is not clearly erroneous. Upon the present record, however, we conclude that the danger should reasonably have been foreseen by Tamiami in time to act with the utmost care to avoid injury to its passengers, particularly by warning them and by not doing foolish things to increase their danger, and that Tamiami breached the duty owed to its passengers, the appellants. The judgment is therefore reversed and the cause remanded with directions[8] to enter judgment for each of the plaintiffs, appellants, and upon the evidence contained in this record, to award each of them reasonable compensatory damages, including damages for physical injury and mental suffering and humiliation.[9]

Reversed and remanded with directions.

quest. Should Any Disturbance Arise, Police Authorities May Be Summoned To Quell Such Disturbance."

6. In United States ex rel. Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71, 82, this Court said:
   " * * * The Supreme Court of Mississippi has said. that, 'We have the right to make use of knowledge of the popular and general customs of the people of this State, and public conditions. therein.' Moore v. Grillis, 1949, 205 Miss. 865, 39 So.2d 505, 508, 10 A.L.R.2d 1425. A like authority and duty is vested in this Court." Citing, City of Hughes Springs, Tex. v. Lips, 5 Cir., 1941, 118 F.2d 238; Rogers v. Douglas Tobacco Board of Trade, 5 Cir., 1957, 244 F.2d 471, 478; Mays v. Burgess, 1945, 79 U.S.App. D.C. 343, 147 F.2d 869, 873, 162 A.L.R. 168; 20 Am.Jur., Evidence, Sec. 108.

7. Pelot v. Atlantic Coast Line R. Co., 1911, 60 Fla. 159, 53 So. 937, 938.

8. See 28 U.S.C.A. § 2106.

9. See Atlantic Greyhound Lines v. Lovett, 1938, 134 Fla. 505, 184 So. 133, 140.