Reverend Negil L. McPHERSON,
Appellant,

v.

TAMIAMI TRAIL TOURS, INC. and Ned
C. Boutwell, Appellees.

No. 23452.

United States Court of Appeals
Fifth Circuit.

July 6, 1967.

Rehearing Denied Oct. 18, 1967.

Rehearing En Banc Denied
Oct. 18, 1967.

**528**

Howard Moore, Jr., Atlanta, Ga., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Charles Stephen Ralston, New York City, for appellant.

Melburne D. McLendon, Bryan, Carter, Ansley & Smith, Atlanta, Ga., for appellees.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and BREWSTER, District Judge.

TUTTLE, Chief Judge:

This is an appeal from a denial of motions for directed verdict and for judgment notwithstanding the verdict or, in the alternative, for a new trial in a civil action for damages brought in the District Court for the Northern District of Georgia.

As the appellant recognizes, he has a heavy burden to carry when seeking to have an issue of negligence withdrawn from the jury in the Federal Court.

"In ruling on the motion for directed verdict or for judgment now, it is the duty of the trial court to take that view of the evidence most favorable to the party against whom the motion is made, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for him." 6 Moore's Federal Practice, Sec. 59.08 (5) at 3814.

Professor Wright says:

"The evidence must be viewed in the light most favorable to the party against whom the motion is made, he must be given the benefit of all legitimate inferences which may be drawn in his favor from that evidence, and the motion must be denied if, so viewed, reasonable men might differ as to the conclusions of fact to be drawn." Wright Federal Courts, Sec. 95 at 370.

The appellant here, not challenging these principles, states in his brief that "The evidence must be construed in the light most favorable to the party against whom the motion is made," and "If reasonable men could differ as to the conclusions of fact to be drawn," the motion should be denied, but then says that, taking all of the evidence as to the historical events that occurred at the time of the unprovoked attack on the appellant by a fellow passenger on the appellee's bus, as testified to by the witnesses for the appellee, the story thus related demanded a finding by the jury that the Tamiami Trail Tours, Inc. and its driver had failed to discharge that exceptionally high degree of care owed by them to a passenger, and that the failure of the jury to find accordingly required the entry of a judgment notwithstanding the verdict by the trial court.

This case, although not presenting as extreme a situation as that depicted in the opinion of this court in Bullock v. Tamiami Trail Tours, Inc., 266 F.2d 326, 5th Cir., resembled the earlier case in many respects. It arose out of an unprovoked, vicious attack by a white man on a Negro passenger sitting in the forward part of a bus owned and operated by the appellee in the State of Georgia just at the period of time when the issue of public transportation desegregation was at its highest emotional pitch.[1]

---

1. It is a coincidence that September 22, 1961, the date on which the Rev. Mr. Mc-Pherson was attacked is the very date on which the Interstate Commerce Commis-

■ It is without dispute that the bus company's version of the facts, wherever this version differs from that of the plaintiff below, must be accepted for the purpose of the motion for judgment notwithstanding verdict. We here outline the facts which the jury was warranted in believing in its consideration of the question whether Tamiami Trail Tours, Inc. breached its duty owed to the plaintiff.

The plaintiff, the Rev. Negil L. McPherson, was a Negro minister, a native and citizen of the Commonwealth of Jamaica, then residing in Springfield, Illinois. He had been in Georgia and in Tennessee for part of his stay of several years in the United States and was somewhat familiar with the problem of segregation as then practiced in the Southern states in this country.

When he first came to the attention of the defendant, Boutwell, the driver of the bus, which he sought to board on September 22, 1961, at the Trailways Station in Atlanta, he offered his ticket to board the bus after pushing ahead of other passengers, including some women. The bus operator delayed his boarding the bus until after five or six other passengers had been permitted to enter. At this time, the bus driver heard someone make statements such as, "I will take care of him", or "He should be taken care of," but he did not know or attempt to find out who made these remarks. McPherson boarded the bus and took either the third, fourth or fifth seat on the right-hand side of the bus. Shortly after this, the driver came onto the bus and, we here quote from the brief of the appellee: "Upon entering the bus, the driver noted there were several people seated in the first few seats of the bus, including the appellant who was seated on the right side in the third seat. The driver, while not necessarily expecting any trouble, remembered the complaining outside the bus; and, noting that the appellant was sitting in the midst of those passengers who had already entered the bus, recognized the possibility that the complaining person might well be on the bus, but he had no idea who it might have been. Recognizing it as a delicate situation, the bus driver in a normal voice suggested to the appellant that he move to the other side of the bus, one or two seats further back.[2]

McPherson refused to move and the driver went outside the bus to admit other persons, then later came into the bus again and asked McPherson again if he was going to take the other seat. The passenger declined to do so and asked the driver why he should move, to which the driver responded, "Well, I asked you to." As the driver walked back to the front of the bus again, McPherson asked him again why he should move and the driver said that he had "answered him the first time he asked me." Thereafter, McPherson asked him again why he should move and the bus driver said that after he had gotten back up to the front of the bus, "I finally told him for his own safety." Just before the bus started, one of two men who were sitting across the aisle one seat behind that occupied by appellant, tapped him on the shoulder and asked him, "Why don't you do as the man said?" Receiving no answer, he then said, "Where are you going?" McPherson did not answer this and the man said, "You may not reach where you are going."

sion order forbidding future discrimination in operations of interstate motor carriers of passengers ICC No. Mc-C-3358 was promulgated.

2. When cross-examined about this, the bus driver gave the following testimony:
"Q. Why would moving to the other side of the bus protect him?
"A. He would have been two or three seats further back.

"Q. What effect would that have had on his alleged assailants?
"A. Well, you know, all of this desegregation had just begun to start a little after that and you know how the people of the South were still feeling about that time. I knew, you knew and he knew. All precautions you could take to keep anything down would probably be best."

By this time the passengers had got on and the bus driver came in and the bus left the depot. McPherson did not tell the bus driver that the man had spoken to him. After the bus left the depot and got out on the highway toward Griffin, the white man, who in the meantime had asked the bus driver if he could get off the bus at any place and had received the reply that all he had to do was to pull the cord, moved over and sat down in the seat where McPherson was sitting. He said, "Why didn't you do as the bus driver and I told you?" McPherson said, "I am sitting here, I am not bothering anyone." And he also said, "In my country we sit wherever there is a vacant seat." To this the other replied, "You are not in your country now and I am going to kill you." He clenched his fist and began hitting McPherson in the head and on his face.[3] McPherson called the bus driver and pulled the cord. The bus stopped. The bus driver was disturbed over the fact that a lady with a small child wished to get off and he stepped out on the ground and then came back in and saw the assailant strike McPherson one blow. In the meantime, a white passenger named Hicks, sitting at the rear of the bus, had come up and undertaken to separate the assailant and McPherson, but when the bus driver came down the aisle, the assailant spun him around and pushed him out the aisle and out of the bus. He then disappeared. Boutwell, the bus driver, made no inquiry of the injured man and made no effort to obtain the names of witnesses until after he had made his regular stop at Jonesboro and then moved on towards Griffin. Then he stopped on the open highway and obtained the names of some of the passengers. The bus proceeded to Griffin, at which point McPherson left the bus and went to the hospital in that city where he was treated for his injuries.

Of course, McPherson's testimony as to the occurrence differed somewhat from that which is outlined above. He testified that the bus driver initially had refused to take his ticket, although he had not crowded ahead of anyone. He also testified that the bus driver spoke to the two men sitting across the aisle from him, when one of them inquired as to whether he could get off at any point and thereafter said to McPherson, "I don't care who jumps you," when McPherson asked him why he should move. McPherson's testimony does not contain any statement that he heard the driver respond finally to the inquiry as to why he should move his seat by saying, "For your safety." There is no evidence that this remark when the driver was back at his seat in the front of the bus was heard by McPherson.[4]

Boutwell made no report either at Jonesboro or at Griffin to any police officers concerning the attack made on his passenger. He made no inquiry of McPherson as to his condition or whether his injuries were slight or serious. Upon leaving the bus at Griffin, McPherson said, "Thank you."[5]

---

3. The narration of this exchange between the assailant and McPherson is based on the latter's testimony, but it is not disputed. It is partially supported by a defense witness who was sitting just behind the driver and overheard the white man, "kept telling him to move back, and he didn't move, and so then the boy (a man she later said appeared to be between 28 and 35 years old) just got up and started beating him."

4. In an effort to impeach the driver as to the point, it was brought out that on giving his original deposition touching on his request that McPherson move, Boutwell had made no comment about his request being for the passenger's safety.

5. In his testimony he explained this by saying:
"For the treatment I had received and with no help from Mr. Boutwell, I said to him, 'Thank you.'
"Q. Were you grateful to him? Is that the reason you said, 'Thank you.'?
"A. We don't say 'Thank you' always for gratefulness. If something—this particular time they say to you you should pray for those who despitefully

■ Here there was no attempt by the appellant to question the right of the jury to pass upon the historical facts that occurred on the afternoon of September 22, 1961. We have, rather, the contention of appellant that taking the facts as testified to by the appellee and on its behalf, the trial court should have concluded, as a matter of law, that the bus company did not meet the standard of care which it owed to its passenger. If this proposition is established, it of course, falls within the purview of proper judicial review. As stated by this court in Cole v. Usry, 5 Cir., 294 F.2d 426, "We appreciate the extremely limited scope of review by this court of the judgment entered on the jury's verdict. (Footnote omitted). Nevertheless, this court owes a duty not as a mere automation, but as a judicial function to determine whether there is really a rational basis for a jury's verdict. See Reuter v. Eastern Air Lines, 5 Cir., 1965, 226 F.2d 443, 445."

Then, after discussing the facts of that case (tried to a jury) dealing with the question whether real estate sold by a taxpayer was sold as a capital asset or was a sale of property held for sale to customers in the ordinary course of business, this court said:

> "Somewhat paradoxically in the present case, a clearer view can be had of the reasonableness of the answer to the ultimate question, than of whether different conclusions could reasonably be reached on any one or more of the factors to be considered in answering that question. Considering the case in its entirety, it seems clear to us that the controlling facts are so extreme as to make it utterly unreasonable to hold that the property here involved was held by the taxpayers primarily for sale to their customers in the ordinary

course of their trade or business. Unless every jury verdict in cases of this kind is to be upheld, this one should be set aside, and judgment for the plaintiffs should be entered notwithstanding the verdict." 294 F.2d 426, 430.

And now, the question here is whether the fact that the bus driver, within the hearing of the man who subsequently attacked him, told McPherson to move to the rear of the bus and, when asked the reason for such a request, said: "Well, I asked you to," at a time when the driver had heard someone near the entrance of the bus make threats against the passenger which he did not communicate to the passenger in order to give him an opportunity to exercise his judgment whether such threats presented him with a serious danger,[6] (all of which facts are undisputed on this record.), constituted a failure of the driver to use that degree of care which, under the laws of the State of Georgia is owed to a passenger.

■ The Georgia standard of care owed by a common carrier to its passenger is as strict as any that can be imagined short of insuring the safety of the passenger. The Georgia Supreme Court has expressed it in these terms:

> "A railroad company is bound to use extraordinary care and diligence to protect its passengers, while in transit, from violence, injury, or outrage and humiliation by third parties. Brunswick & Western R.R. Co. v. Ponder, 117 Ga. 63, 43 S.E. 430, 60 L.R.A. 713, 97 Am.St.Rep. 152. This duty applies whether the passenger is white or colored. This protection must be afforded by the *conductor to the extent of all the power with which he is clothed by the company or by the law*, and his failure to afford it, when he has knowledge that there is occa-

---

use you, and upon this basis I said 'Thank you' to him.

"Q. Are you suggesting that perhaps it was sarcasm rather than for appreciation?

"A. I could not have appreciated getting beaten and getting my head swollen

and my nose broken and have a headache."

6. It will be noted that after the passenger Hicks intervened and stopped the beating, McPherson did accept Hicks' suggestion that he move to the back of the bus, for his further safety.

sion for his interference, will subject the company to liability and damages." Hillman v. Ga. R.R. & Banking Co., 126 Ga. 814, 817, 56 S.E. 68, 69.

In Yellow Cab Co. of Atlanta v. Carmichael, 33 Ga.App. 364, 126 S.E. 269, it was stated as follows:

"A common carrier of passengers for hire is bound to use extraordinary care and diligence to protect its passengers in transit from violence or injury by third persons; and whenever a carrier through its agents and servants, *knows, or has opportunity to know* of a *threatened* injury to a passenger from third persons, whether such persons are passengers or not, or when the circumstances are such that an injury to a passenger from such a source *might reasonably be anticipated,* and proper precautions are not taken to prevent the injury, the carrier is liable for damages resulting therefrom." (Emphasis supplied.)

In the case of Bullock v. Tamiami Trail Tours, Inc., 5th Cir., 266 F.2d 326, a Florida case in which the standard of care was no greater than is required under the Georgia decisions, dealt with what constituted "proper precaution." This Court found as a matter of law that the failure to warn the passenger of facts endangering the passenger known to the driver required the setting aside of a judgment in favor of the carrier and *required the entry of a judgment favoring the plaintiff* on the issue of liability. In that case, the conversation of the bus drivers in the restaurant at the bus stop was thought to be responsible for the person who later became the assailant to get on the bus and attack the couple. The court explained that among the other failures to comply with the standard of care required were the following:

"The next question is whether or not Tamiami, so charged with the duty of foreseeing danger to its passengers, took proper precautions to avoid such danger by the 'utmost care and diligence of a very cautious person.' (Footnote citing Pelot v. Atlanta Coast Line R.R. Co., 1911, 60 Fla. 159, 53 So. 937, 938.) We think that Tamiami failed to exercise this care *in several* ways. It should have instructed its agency in Jamaica to advise Negroes applying for passage through the southern part of the United States of the South's tradition of segregation. (This is not applicable here.) It should have instructed its drivers to advise Negroes who were obviously foreigners, here known to be such, of segregation customs. (This is probably not applicable here.) *The driver should have explained to the Bullocks his reason for wanting them to move.* Above all, the driver should not, either wilfully or negligently, have informed the assailant of the Bullocks' position on the bus and of their apparent color and lack of color." (Not applicable here except for the request made by the bus driver of McPherson in the presence of the other passengers that he move farther back in the bus.)

Although the *Bullock* case was an appeal from a trial by a court without a jury, we think the standard of care set up and the measure of the duty owed by the bus company is to be uniformly applied whether in the trial before a court without a jury or in a jury trial. The court did not merely reverse that case for application of the proper standard; we reversed for entry of a judgment on liability against the carrier.

We cannot say that if Boutwell had explained to the passenger that he thought it would be better for him to move to the back of the bus because he had overheard threats against him outside the bus that McPherson would have moved and would thus have satisfied the pettiness of the self-appointed guardian of the tradition of segregation. Certain it is, however, that the formula used by the driver to cause McPherson to protect himself was the least likely to accomplish this purpose. At the very time that the issue was being tested out on common carriers throughout the South, Boutwell could hardly have chosen a less fortunate method of requesting the passenger to

move than to say in effect: "I want you to move because I told you to." If it was true, as we said in Bullock, that, "The driver should have explained to the Bullocks his reason for wanting them to move," so it is true in this jury case that "The driver should have explained to McPherson his reasons for wanting him to move."

Instead, his request that McPherson move, ostensibly to anyone overhearing the request, for the purpose of maintaining the pattern of segregation, may well have been taken by the passengers as an open invitation to take direct action, as one of them did.

■ The standard of care owed by a carrier is high. No higher standard can be envisioned than that announced by the Supreme Court of Georgia as far back as 1906 when it says that this protection "must be afforded by the conductor to the extent of all the power with which he is clothed, by the company or by the law." Hillman v. Ga. R. R. & Banking Co., supra.

■ There is no dispute on this record that driver Boutwell failed to exercise this degree of care when he asked the Negro passenger to move to the rear of the bus, because "I asked you to," without informing the passenger at the same time that he had heard someone near the bus entrance make threats against him. The fact that Boutwell testified that he thought the hard feeling exhibited at the bus entrance was due to what he described as McPherson's effort to get ahead of some ladies to get on the bus or that he didn't *really* expect any danger does not lessen the obligation owed by the carrier once the passenger has been accepted and is brought within the care of the driver. This obligation, we said in *Bullock,* included informing the passenger of the facts which brought about the request to move to the rear of the bus.

■ We conclude that the principle laid down in the *Bullock* case dealing with the duty of the bus company to acquaint a passenger of any threat of danger known to it requires a reversal of the order of the trial court denying the judgment notwithstanding the verdict.

The judgment is reversed and the case is remanded to the trial court for their entry of a judgment in the issue of liability and for further proceedings not inconsistent with this opinion.

BREWSTER, District Judge (dissenting):

I respectfully dissent.

If the issue before us were whether the assault on the appellant by the bus passenger was unjustified, there would be no dissent among the members of this panel; and this dissent does not condone the attack in any way. Our problem, however, is to determine whether the evidence requires that money be taken away from the appellee bus company and given to the appellant on account of the injuries resulting to him from that incident. The only way such relief can be given the appellant, in the face of the jury verdict against him, is for us to hold as a matter of law *both* that the bus driver was negligent and that such negligence was a proximate cause of appellant's injuries. Modern Coach Corp. v. Faver, 87 Ga. App. 221, 73 S.E.2d 497 (1957); Atlanta Transit System v. Allen, 96 Ga.App. 622, 101 S.E.2d 134 (1959). The quotations just below are taken from those cases.

Faver, 73 S.E.2d at 502: " * * * It is a jury question whether the defendant bus driver was negligent in the particulars alleged, and if so, whether his negligence caused the injury."

Allen, 101 S.E.2d at 144: " * * * The rule in negligence cases is that each must stand on its own bottom, and that where reasonable minds might differ, either as to the proximate cause, the degree of the negligence of the defendant, or the contributory negligence of the plaintiff, such case should be decided by a jury and not by the court. (citing cases)."

It is my opinion that both negligence and proximate cause were questions of fact for the jury under the evidence in

this case, and that the Court has no right to override its decisions on either of those matters.

Hardware Mutual Ins. Co. v. Lukken, 10 Cir., 372 F.2d 8, 10 (1967), contains a recent statement of the universally accepted rule for determining whether a jury verdict in a negligence case should be set aside. The Court there said:

"Hardware first complains of the court's refusal to direct a verdict or grant judgment n. o. v. in its favor. This means, of course, that Hardware *has the heavy burden of convincing us that actionable negligence is the only permissible inference which can be drawn from the established facts.* Christopherson v. Humphrey, 10 Cir., 366 F.2d 323. See High Voltage Engineering Corp. v. Pierce, 10 Cir., 359 F.2d 33; United States v. Hess, 10 Cir., 341 F.2d 444; Chicago, Rock Island and Pacific Railroad Co. v. Hugh Breeding Line, 10 Cir., 232 F.2d 584; Lussan v. Grain Dealers Mutual Ins. Co., 5 Cir., 280 F.2d 491. *The facts were susceptible of more than one inference, and therefore the issue of negligence was for the jury.*" (Emphasis added).

The outline of the evidence in the majority opinion is accurate. That evidence has been interpreted, however, in some important instances more in the light of the inferences that the majority would have drawn, or would like to have seen drawn, rather than of the inferences *most* favorable to the appellees the law requires us to draw. It will be more feasible to set out the version I consider the jury could have permissibly accepted than to try to point out singly those instances of disagreement. My judgment is that when the evidence is viewed objectively in the light most favorable to the appellees, we must say that the jury could have drawn the inferences that follow, regardless of how we would have found if we had been the trier of facts.

At the time of the incident in question, the appellant was thoroughly familiar with the practice of racial segregation in the South generally and with the hostile attitude of the die-hard element towards all attempts to end it. It is true that he was a citizen of Jamaica; but he came to this country on a student visa in the year the decision in Brown v. Board of Education was handed down, and has lived continuously in Tennessee and Georgia during the seven racially turbulent years that followed in each of those and other southern states. He had spent those seven years getting a college education and studying for the ministry. He had degrees from American Baptist Seminary and Fisk University, both predominantly Negro institutions in Nashville, Tennessee, and was just beginning his second year at Interdenominational Theological Center at the time of the incident on the bus. During his last two years in Nashville, he went with a young woman he had met at Fisk University. She had grown up in her native state of South Carolina. She went to Griffin, Georgia, on August 28, 1961 to teach school, and married appellant on the September 10th following. He went to school in Atlanta from Monday to Friday, and spent the weekends at his home in Griffin. Unless he got a ride with friends, he commuted on the bus; and he had ridden the Tamiami bus back or forth between Atlanta and Griffin about six times before the trip that gave rise to this suit.

On September 22, 1961, the Interstate Commerce Commission entered an order forbidding racial discrimination in operations of motor carriers of passengers. That was on a Friday when the appellant was going from Atlanta to his home in Griffin on the bus leaving at 5:45 P.M., a time of day when he could expect the bus to be crowded. There was a number of people ahead of him on the bus loading platform when the time came to board, but he pushed his way ahead of at least five of them, including some women, and offered his ticket. The bus driver followed the established practice of taking tickets from those who were nearest the door, and accepted the appellant's in the order he would have pre-

sented it if he had not shoved ahead of the others. The appellant boarded the bus and took the third seat from the front on the right side. The appellant's conduct in pushing ahead of the women had provoked some "rumbling and grumbling" among persons in the crowd on and around the loading platform. The bus driver did not know exactly what was said, who said it, or whether the person or persons grumbling got on the bus. Conduct of that kind was commonplace in connection with racial problems in those days, and the driver had never seen it result in any trouble. He did not consider that the appellant was in any danger. However, when he went on the bus to assist a woman passenger with her luggage, he noticed that appellant was seated in a group of white passengers, and out of utmost precaution said to him in a normal, conversational tone, "How about taking a seat over on this other side?" He pointed to a seat on the other side of the bus only one or two seats back, and made no effort to get appellant to move to the back of the bus. The appellant's answer was that he was going to sit where he was, and the driver could not make him move. He then asked why he should move, and the driver's answer was, "Well, I asked you to." Even though the driver made no further effort to get appellant to change his seat, the appellant continued to ask over and over why he should move. The driver finally told him he was asking him to do it for his own safety. The appellant did not move, and the driver went back to the platform to continue the loading of passengers.

While the driver was then taking tickets on the loading platform, a male passenger already on the bus tapped appellant on the shoulder and asked him why he did not move. There was no answer, and the man then inquired as to where appellant was going. Again, the appellant gave no answer; and the man said to him, "You may not reach where you are going." That took place around fifteen minutes to twenty minutes before the bus left Atlanta, and the appel-

lant did not move to another seat. He did not report the incident to anyone, and the driver knew nothing about it.

The bus left the station, and was proceeding south along the four lane expressway between Atlanta and Jonesboro when the trouble happened. After the bus was a few miles beyond the city limits of Atlanta, someone pulled the cord to stop it. A large, young white man started beating the appellant around the head with his fists at about the time the bus was stopping; but the driver did not know it as his attention was occupied with getting the bus on the shoulder and stopping it, and his view of the passenger section was obstructed by the presence of several people standing in the aisle near the front of the bus waiting to get off. It was nothing unusual for the bus to unload passengers between cities as it stopped anywhere the stop cord was pulled. A woman and her small child were among the passengers standing near the front to get off. The child was subject to having convulsions and the driver knew from previous trips that she had been very ill. He helped the woman and child off, and got back on as soon as the other passengers standing near the door had dismounted. As he got in the bus, he saw the white man slap the appellant. That was the first time he knew of any trouble.

One of the passengers on the bus was a Mr. Hicks who had theretofore been a police officer in Atlanta. He was seated in the back, but went forward promptly and tried to stop the assailant. Mr. Hicks, like the driver, was an average size man, and was having difficulty handling the powerful, younger man. As soon as the driver saw there was trouble, he also intervened to try to stop it. The assailant told the driver to stay out of it, as it was no affair of the driver, and drew back his fist to hit the driver. A woman screamed for him not to strike the driver and he did not do it. Hicks and the driver together finally pulled the assailant off the appellant; and the assailant grabbed the driver and shoved him ahead and out of the bus. When the

assailant hit the ground, he left. Hicks took the appellant by the arm and led him to the back seat on the bus. No one connected with the case knew the identity of the assailant.

The appellant made no complaint of any injury. He did not get off the bus at Jonesboro. As he left it at Griffin, he thanked the bus driver. At his wife's insistence, he went to a doctor in Griffin. The doctor found no permanent or serious injuries.

The majority says that it was established as a matter of law that the bus driver heard someone on or near the bus loading platform "make such statements as, 'I will take care of him', or 'He should be taken care of'." It further says as a matter of law that the failure of the bus driver to advise the appellant particularly of such statements was negligence and a proximate cause of his injuries.

From my understanding of the case, there were permissible inferences, other than those drawn by the majority, as to whether either of those remarks was made, as to which one, if any, was made, as to the interpretation to be put on such remark as was made, as to whether the bus driver was negligent in failing to communicate to appellant whatever remarks were actually made, and as to whether such negligence, if any so found, was a proximate cause of appellant's injuries.

It would unduly lengthen this opinion to go into the detailed discussion necessary to point out that the jury was not bound as a matter of law to conclude that the remarks that are the foundation of the majority's holding of actionable negligence were actually made. The only evidence on this matter was the bus driver's testimony given on examination by opposing counsel.[1] While it

---

1. The bus driver was called by appellant as an adverse witness. The following testimony given by him on examination by counsel for appellant is all the evidence there is about the "remarks" in question:

"Q. Tell this Court and jury why you asked the plaintiff to move.

"A. I asked him to move because I had heard some rumbling and grumbling on the outside of the bus before—excuse me—before the other folks got on that since he had walked in front of some other people and seemed to upset some of them, I didn't look up to see who was grumbling or anything, but at the point I didn't know where the grumbling party or the parties, whichever it was, had already boarded the bus, whether they were still outside or not.

"Q. Now—

"A. And so I figured if they had boarded the bus, since the ones that were on were up around the front of the bus, I figured it would be a good idea if they were grumbling about him, and which I thought at the time they were, because of what he had done outside, I figured maybe it would be a good idea to get him away from this few people that was already on there and out of their area right around in there, to quell things as much as I could, if anything possible could arise from what I had overheard outside.

"Q. All right. So, you knew when you first got on the bus to help the lady with the suitcase the Plaintiff was in danger, didn't you?

"A. No, I didn't know he was in danger.

"Q. You knew when you first got on the bus, didn't you, that there had been some rumbling and there was likely to be some harm to the plaintiff?

"A. I knew there had been some rumbling, but I wasn't sure there would be any harm to anybody.

"Q. Now, at the time you spoke to the plaintiff on the bus, the first time when you got on there, you had overheard some white men outside say the following words, didn't you: 'I will take care of him,' or 'He should be taken care of', you had heard those words?

"A. Whether they were white men or colored men, I don't know.

"Q. There were no other colored men in the line other than the Reverend McPherson, were there?

"A. I couldn't definitely say to that.

"Q. So you don't know whether there were colored men in the line, or not, do you?

"A. I definitely do not.

"Q. And you never investigated to find out who made that remark, did you?

"A. No; I didn't. I couldn't very well investigate the whole crowd because I had no idea who might have said it.

"Q. And you never investigated the people on the bus either, did you?

was certainly susceptible of the interpretation that he heard specific remarks, the jury could have reasonably concluded that he heard only rumbling and grum-

"A. There was no reason to investigate the people on the bus, I didn't think.

"Q. Didn't you suspect something was going to happen?

"A. No; I didn't know at the present time. I was just trying to make sure that nothing did happen.

"Q. You were making sure something didn't happen, and, yet, you didn't suspect anything would happen?

"A. I didn't suspect anything would happen.

"Q. Now, you didn't tell the plaintiff that you overheard these men outside saying these words, 'I'll take care of him', or 'He should be taken care of', did you?

"A. No.

"Q. And, so, Mr. Boutwell, when you heard this remark you decided you would go in the bus and take care of the plaintiff, didn't you?

"A. Not take care of him. As I stated before, I felt like it would be a good idea, if someone had said it, or the ones, had already gotten on the bus, it would be a good idea to get him out of the area.

"Q. You never thought it was—and if he hadn't gotten on the bus; then there was nothing I could do about where he sat. (sic).

"Q. You never thought it was a good idea to ascertain where these people were that made the remark, did you?

"A. I couldn't determine that anyway outside because the remark came out of the crowd.

"Q. But you could have determined it inside, couldn't you?

"A. No; I couldn't, because it wasn't made inside.

"Q. You never warned anybody who was getting on that bus that they couldn't cause any disturbance or incident on the bus, did you?

"A. No. You don't normally do that.

"Q. You suspected an incident would happen, didn't you?

"A. I didn't suspect it.

"Q. You didn't? Mr. Boutwell, you didn't ever tell the plaintiff, did you, that he was in danger?

"A. I didn't think he was in danger.

"Q. But, yet, you asked him to move?

"A. That's correct; in order to make sure the remarks I had heard outside would be quietened down then and nothing else to it.

"Q. That is, if he gave up his seat—

"A. Not necessarily gave up his seat. That is not why I asked him to move.

"Q. You asked him to move because of remarks you had heard outside, is that right?

"A. That's correct."

\* \* \* \* \*

"Q. Don't you think you should have inquired?

"A. No.

"The Witness: I would like to give an answer to that.

"The Court: Yes, sir; you can.

"The Witness: I didn't think there was any reason to inquire, because, like I said, I wasn't definite as to who had the remarks or grumbling outside, or whatever it was, and whether the man was on the bus at the time or still outside. I didn't know and I couldn't go around and point everybody out and ask him if he was going to cause any trouble on my bus."

\* \* \* \* \*

"Q. Did you hear any additional rumbling while you were out taking up tickets?

"A. Not after the first.

"Q. Now, after you took up the tickets you got on the bus and drove away; is that correct?

"A. After I had finished loading.

"Q. You didn't report this to the station superintendent, did you?

"A. No; I didn't have anything to report.

"Q. You didn't report it to the policeman on duty at the station, did you?

"A. We don't have a regular policeman on duty at the station.

"Q. You never considered it your duty to perhaps call one, did you?

"A. No; because I didn't have anything to report.

"Q. You weren't—you didn't have anything to report? And yet you feared for the plaintiff safety?

"A. I didn't fear for his safety. I just asked him to take another seat just in case.

"Q. In case of what?

"A. Just in case those remarks that I had heard outside, that that man was getting on my bus or whether he was passing by.

"Q. You didn't—you just didn't bother to find out whether he was on your bus or just passing by?

"A. There is no way I could have found out.

"Q. When you say there is no way you could find out, what you mean is you didn't do anything to find out?

bling and that the "remarks" in question were only figments of the imagination of opposing counsel. They appear only in questions of that counsel, and those questions were not so framed as to get a direct response from the witness as to whether he heard such remarks. The questions usually focused the witness' attention on something besides answering directly that the remarks were or were not made. The very fact that counsel himself could not settle on which remark was made shows that there was enough uncertainty about the matter that we cannot foreclose it as a matter of law.

Assume, however, that the bus driver heard a specific remark, rather than just mumbling or grumbling. We cannot say as a matter of law that it was, "I will take care of him", or "He should be taken care of." The least that we can say is that it was a question of fact for the jury to determine which one was made. The two remarks are susceptible of entirely different implications. The first one is in the nature of a specific threat by a person speaking for himself. The second one could be construed merely as an observation carrying no intention of action. It is the kind of statement that could have been made by one of the women whom the appellant was trying to push ahead of to be one of the first passengers on the bus. Under the rule that we must decide this question on the basis of the permissible inferences most favorable to the appellees, we must assume that the jury concluded that the milder of the two remarks was the one that was made, and that it gave such remark the most harmless inference possible under the evidence.

Even if there were no question about the majority's premise as to the "remarks", negligence was still a question of fact for the jury under this evidence.

The generally accepted rule in negligence cases is that where the evidence shows that substantial care was used, the question of whether that care was sufficient to meet the required standard of prudence is one of fact for the jury. Wichita Valley Ry. Co. v. Fite, Tex.Civ. App., 78 S.W.2d 714, 716, no writ history; Texas & N.O.R. Co. v. Pettitt, Tex.Civ. App., 290 S.W.2d 730, no writ history; Merlino v. Southern Pac. Co., 132 Cal. App.2d 58, 281 P.2d 583; Balthrop v. Atchison, Topeka & Santa Fe Ry. Co., 167 Cal.App.2d 437, 334 P.2d 1041, 1043; Redwing Carriers, Inc. v. Helwig, Fla. App., 108 So.2d 620; Langston v. Chicago & N. W. Ry. Co., 330 Ill.App. 260, 70 N.E.2d 852, 860. This is not a case where the bus driver used no care whatever, as in Bullock v. Tamiami Trail Tours, Inc., cited in the majority opinion. The majority admits that there was evidence from which the jury could have permissibly concluded that the bus driver did everything that could have been expected of him except to go back and tell the appellant that he had heard someone on the loading platform "make statements such as, 'I will take care of him,' or 'He should be taken care of'." My opinion is that it was for the jury to say whether this one omission, if it occurred, was a failure to use the required extraordinary diligence. 105 Georgia Code Annotated, Section 202, defines "extraordinary diligence" as "that extreme care and caution which very prudent and thoughtful persons exercise under the same or similar circumstances." When the permissible inferences most favorable to the appellees are accepted, we must say that a very prudent person in the position of the bus driver would have acted under these circumstances: (1) The slightest effort to get a Negro to move from his chosen seat on that day when the I.C.C. Regula-

"A. I done all possible.
"Q. And that was ask the plaintiff to move?
"A. That's right."
     *     *     *     *     *
"Q. In any event, before leaving the station you didn't report the incident or

the remarks to the station superintendent, did you?
"A. No, I didn't, because you hear remarks all the time, and so far those remarks you hear have never meant anything.

tion abolishing segregated seating on interstate carriers became effective would be likely to get the bus company sued under the Civil Rights Act. (2) The appellant seriously resented a suggestion made by the bus driver that he move, not to the rear of the bus, but just to the other side a few seats back from the group around him, even though he was told that the suggestion was for his own safety. (3) It was not known whether the person doing the mumbling or grumbling or making the remarks was at the loading platform waiting to get on the bus or was merely standing by to see a relative or friend off. (4) It was not known whether the assailant had any connection with the making of the remarks or whether he even heard them. (5) Whether the remarks on the loading platform could be definitely identified or were just mumbling and grumbling, they were the kind frequently heard when the racial issue came up in connection with bus travel, and the bus driver had never known them to result in trouble. (6) The bus driver's judgment of the likelihood of damages from the remarks was corroborated by the weight the appellant attached to much more serious statements made to him by a fellow passenger after they got on the bus. The statement by the large, white man, who later became the assailant, made in a hostile manner, that, "You may not reach where you are going", was a much more serious threat than the "remarks", whatever they were, on the loading platform. There was no question about who made the threat, about the fact that he was a passenger on the bus, or about the fact that he was big enough to try to carry out the threat. The appellant did not regard the likelihood of danger to be great enough to report the matter to the bus driver or to anyone in the bus station, even though

he had 15 or 20 minutes to do so before departure time. Under these and the other circumstances supported by permissible inferences from the evidence, the jury was acting within its authority in concluding that the bus driver in this case went just as far as an extraordinarily prudent person in his position would have gone under the circumstances.

We have an anomalous situation here where the majority says that the bus driver did not do enough to get the appellant to move his seat, and the appellant says that he did too much. The complaint in this case contained not only a count for personal injuries based on allegations of negligence, but also one for damages predicated on allegations that the bus driver violated appellant's civil rights in trying to get him to move from the seat he had chosen. When the judge was discussing the charge with the lawyers before their arguments, the appellant strenuously insisted that he was entitled to damages on the civil rights count separate from those for his personal injuries. He still urges on appeal that the driver's suggestion that he move was done under color of state law,[2] and that the mere request that he move was "discrimination *per se*" which "subjected him to the humiliation and degradation of segregation." That the appellant himself does not sincerely contend that the bus driver should have done more to get him to move is evidenced by the following statement in his brief: "The fact that this act of taking the first unoccupied and convenient seat was 'offensive and provocative' can in no way legally explain or justify the bus driver's direction to move further to the rear." His brief here asks us to hold as a matter of law that the bus driver violated his civil rights in going as far as he did to get him to move.[3] I hardly see how we

2. Georgia Code Annotated, Section 68–616.

3. "The right herein involved is the right to travel upon an intrastate bus without being segregated. Morgan v. [Com. of] Virginia, 328 U.S. 373 [66 S.Ct. 1050, 90 L.Ed. 1317] ; Boynton v. [Com. of] Vir-

ginia, 364 U.S. 454 [81 S.Ct. 182, 5 L. Ed.2d 206]. Appellees deprived McPherson of the right to be free of discrimination or segregation because of his race or color while traveling upon an intrastate bus. The seat which appellant first selected was convenient, comfortable, and

can go to the other extreme and say as a matter of law that the bus driver did not do enough by merely failing to tell the appellant that he heard some specific threats, when nobody knows what the threats were, and the bus driver did tell him that the move should be made for his safety.

The premise of the majority opinion that the failure of the driver to inform the appellant particularly of the "remarks" in question was actionable negligence is not sound unless we can say as a matter of law that such failure was a proximate cause of appellant's injuries. To do that, we must hold that beyond question the appellant would have changed his conduct if he had had such information. While that is one possible inference that can be drawn from the evidence, it is not the *only* one, and it is not the one most favorable to the appellees. The jury could have permissibly inferred that the appellant was determined to remain where he was, as he had a right to do, regardless of what anyone said. His whole conduct indicates that. The majority opinion predicates its view of the causal issue on the fact that appellant did finally move to the rear of the bus. That conduct is no criterion because it took place after the appellant had been mauled by his assailant. The jury could have legitimately drawn the conclusion that, until he was actually attacked, the appellant was convinced that there would be nothing more than just mouthing about his taking a seat in the forward part of the bus. When the jury took into consideration that appellant not only refused to move, but also made some issue out of his right to remain in his seat, even after he had been

told that the suggestion to move just a few seats back was for his safety, it could well have legitimately inferred that he would have remained in his seat even if the bus driver had told him what he heard while on the loading platform. Such an inference would have been strongly supported by the fact that the appellant did not move when the man seated behind him made the more serious threat that has been discussed above. Under Georgia law, proximate cause is a question of fact for the jury and "will not be determined by the courts as a matter of law except in palpably clear, plain and undisputed cases." Swift & Co. v. Morgan & Sturdivant, 5 Cir., 214 F.2d 115, 49 A.L.R.2d 924 (1954); Stanaland v. Atlantic Coast Line R. Co., 5 Cir., 192 F.2d 432 (1951); Southern Ry. Co. v. United States, 5 Cir., 197 F.2d 922 (1952). This is a case where it is possible for reasonable men in an impartial exercise of their judgment to draw inferences favorable to the appellees on the issue of proximate cause, and that matter was therefore a question of fact for the jury.

The *Bullock* case cited by the majority is no authority for overriding the jury verdict in the present case. It went further than any Georgia case had ever gone in its holding that there was actionable negligence as a matter of law where no violation of a statute or official regulation was involved. The majority opinion in this case now goes even further, because it admits that we do not here have "as extreme a situation" as that depicted in the *Bullock* case. There are several grounds upon which the *Bullock* case can be distinguished, but these will suffice: (1) Beyond question, the bus

safe (R. 185, 186). The fact that this act of taking the first unoccupied and convenient seat was 'offensive and provocative' can in no way legally explain or justify the bus driver's direction to move farther to the rear. See Nesmith v. Alford, 318 F.2d 110, 121 (5th Cir. 1963). In the context of this case, the act of directing appellant to move to the rear to state the racial preferences of white passengers is discrimination *per se*. Merely informing the appellant that his

place was in the back of the bus subjected him to the humiliation and degradation of segregation, whether or not he was actually forced to move, for the primary effect of segregation is not so much physical placement as it is the resulting state of mind of the person discriminated against. See Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954). The rear of the bus is the traditional place for the segregated Negro."

driver in *Bullock* intentionally provoked the difficulty. (2) There was no evidence that the bus driver used any care whatever.

The record in this case would impress anyone experienced in litigation with the fact that the appellant received a most fair trial, and that his claims were given serious and deliberate consideration both by the able trial judge and by the jury. I conscientiously believe that this is not a case for judicial surgery, and that the judgment should be affirmed.

## ON PETITION FOR REHEARING
### ORDER

PER CURIAM:

The petition for rehearing is denied.

BEWSTER, District Judge:

I dissent for the reasons set out in my dissenting opinion.

## ON PETITION FOR REHEARING EN BANC

The Court having been polled at the request of one of its members on the question of whether this case should be reheard before the court en banc, and a majority of the circuit judges who are in regular active service not having voted in favor of it, Rule 25a, subparagraphs (a) and (b), the petition for rehearing en banc is denied.

GRIFFIN B. BELL, Circuit Judge, with whom GEWIN, Circuit Judge, joins (dissenting from order denying petition for en banc rehearing):

I respectfully dissent from the action of the majority of the court in denying the petition of appellee Tamiami Trail Tours, Inc. for en banc rehearing. This dissent is based on the firm view that appellee has been deprived of its right to jury trial with respect to disputed questions of fact relating to negligence and proximate cause on the part of the bus driver and whether and to what extent the plaintiff himself may have been negligent.

These issues and the facts surrounding them do not seem to differ from those presented in any run of mine negligence case and the application of the usual standard for directing verdicts is demanded. That standard has consistently been stated to be that the trial judge may grant a directed verdict only when there is no evidence which, if believed, would authorize a verdict against the movant. It is the duty of the trial court to accept as true all of the facts which the evidence tends to prove and to draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion. If the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury. Hogan v. United States, 5 Cir., 1963, 325 F.2d 276; Turner v. Atlantic Coast Line R. Co., 5 Cir., 1961, 292 F.2d 586; Swift & Co. v. Morgan & Sturdivant, 5 Cir., 1954, 214 F.2d 115, 49 A.L.R.2d 924; 2B Barron and Holtzoff (Wright ed.), Federal Practice and Procedure, § 1075; and 5 Moore's Federal Practice, §§ 50–50.12 (2d ed.).

It seems apparent that the majority decision in this case departs from this standard and does deprive appellee of its right to jury trial. No court is empowered to suspend the operation of the Seventh Amendment even where there are overtones of civil rights. While any mistreatment of plaintiff is to be regretted, his claim for damages does not rise above that of any other citizen. His claim, like that of others, must be asserted within constitutional standards including the Seventh Amendment. It is to be emphasized that he has not been awarded a new trial; he has been awarded a directed verdict on liability.

The precedent of this decision will seriously erode Seventh Amendment rights if it is applied to all. It is a mere fiat if it is not to be applied to all.